IRVING, J.,
for the Court.
¶ 1. A Lafayette County jury found David Jackson Williams guilty of murder. Thereafter, the Lafayette County Circuit Court sentenced Williams to life in the custody of the Mississippi Department of Corrections. Feeling aggrieved, Williams appeals and asserts that the circuit court erred when it: (1) refused his request for an assisted-suicide instruction; (2) allowed a priest to claim the priest-penitent privilege regarding conversations that the priest had had with the victim; (3) allowed Dr. Steven Hayne to testify as an expert in the field of forensic pathology; and (4) denied his motion to dismiss based on the allegation that he had been denied his right to a speedy trial. Additionally, Williams claims that he received ineffective assistance of counsel.
¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 3. This appeal centers on the untimely death of Demetria Bracey, who was a stu *763 dent at the University of Mississippi in Oxford, Mississippi. The events that led to Demetria’s death were set into motion when Demetria met Williams on the Internet during January 2005.[1] Shortly after they met, Demetria and Williams formed a romantic relationship.
¶ 4. Demetria and Williams maintained their relationship throughout the early months of 2005. However, during the summer of 2005, Demetria left the United States for an opportunity to study abroad in Paris, France. Demetria and Williams broke up before she left and remained separated for the summer. Sometime after Demetria returned to Oxford, she and Williams resumed their romantic relationship. The events central to this appeal occurred during the second week of November 2005.
¶ 5. At the beginning of the week, Dem-etria uncharacteristically failed to report for band practice and failed to report for her duties as a dorm resident advisor. Later in the week, one of Demetria’s close friends, Jessica Smith, became concerned for Demetria. Jessica called Williams on his cellular telephone and asked him whether he knew where she could find Demetria. Williams reported that Demet-ria’s father was dying and that Demetria had gone home to Jackson, Mississippi, so that she could be with him. Jessica was not able to reach Demetria on her cellular telephone, so she asked Williams for Dem-etria’s father’s telephone number. However, Williams would not give Jessica a telephone number. Williams told Jessica that Demetria’s father would not want Williams to give out his telephone number.
¶ 6. Undeterred, Jessica asked Williams whether he would set up a three-way conference call so she could at least speak to Demetria. Shortly afterward, Williams arranged a conference call, and Jessica was able to talk to Demetria for a short period of time. According to Jessica, Demetria sounded as though she had been crying. Jessica attributed Demetria’s emotional state to her father’s illness. However, Demetria was not at her father’s house. She was not even in Jackson. Instead, Demetria was with Williams at his apartment in Oxford. She had been with Williams in his apartment since Sunday, November 6.
¶ 7. Sometime between late Thursday night and early Friday morning, Demetria died in Williams’s apartment after a kitchen knife penetrated her chest and punctured her right ventricle. Demetria and Williams were the only people in his apartment at that time. During an interview with the Oxford Police Department, Williams claimed that Demetria had killed herself pursuant to a mutual suicide pact.
¶ 8. According to Williams, sometime between Thursday night and Friday morning, he and Demetria both went into one of his closets. During its case-in-chief, the prosecution introduced a transcript of Williams’s interview with the police. In that interview, Williams claimed that he and Demetria each consumed substantial amounts of alcohol and that they each swallowed ten Klonopin tablets. Williams stated that Demetria then stabbed herself with one of his kitchen knives.[2] Williams stated that he was supposed to stab himself at the same time. According to Williams, he tried to stab himself, but his knife did not go in far enough, and he lost *764 consciousness because of the pain, alcohol, and prescription drug he had taken.
¶ 9. Williams claimed that he regained consciousness a couple hours later and discovered that Demetria was dead. Williams told authorities that he removed the knife from Demetria’s chest and threw it across the room. Williams reported that he attempted to kill himself again when he discovered Demetria, but could not do so.
¶ 10. Williams spent the next few days holed up in his apartment drinking beer, watching television, and playing video games. According to Williams, he drank “a lot” during that time. Williams hoped the alcohol would help him find the courage to kill himself. On Saturday, Williams ordered pizza, and around the same time, he received a notice that apartment inspectors would be visiting his apartment. Williams pushed Demetria’s legs into his closet and covered her body with clothes. He slept in another closet so he would not be easily discovered if an inspector entered his apartment.
¶ 11. On the following Tuesday, November 15, 2005, Williams decided to go to his parents’ house in Olive Branch, Mississippi. Williams reportedly asked his parents what he should do. His parents consulted an attorney and subsequently contacted authorities and informed them that they should examine Williams’s apartment. In any event, Williams’s parents had Williams admitted to the BaptisL-DeSoto Hospital in Southaven, Mississippi.
¶ 12. On November 15, 2005, Lieutenant Wes Hatcher of the Oxford Police Department was dispatched to Williams’s apartment. Lieutenant Hatcher went inside Williams’s apartment and discovered Demetria’s body. Lieutenant Hatcher secured Williams’s apartment so that it could be examined by crime-scene investigators. The Oxford Police Department met with Williams the very next day.
¶ 13. On November 16, 2005, Williams was released from the hospital. Two members of the Oxford Police Department drove Williams to Oxford. Williams and his attorney met with Investigator Jimmy Williams of the Oxford Police Department and Master Sergeant John Marsh of the Mississippi Highway Patrol’s criminal investigation bureau. Williams agreed to be interviewed with his attorney present.
¶ 14. During the interview, Williams claimed that Demetria had killed herself. Williams stated that he and Demetria had a suicide pact and that they had started discussing suicide during the summer.
¶ 15. Regarding the night that Demet-ria died, Williams presented the following version of events:
We had kind of talked about committing suicide together and stuff like that and we decided we were going to do it last week and she came over, it was Sunday. We just hung out together, didn’t go to class, she didn’t work, um and we just hung out for a couple of days and decided that we were going to do it that night and she, we both drank a lot and took some pills but it wouldn’t help the pain, you know. And we decided to do it in the closet so it would take longer for people to find us if somebody showed up looking for us and we got knives and went in there and we decided to do it at the same time and mine didn’t go as far in.
Williams also said:
I woke up later and saw that [Demetria] was already dead. And I got the knife out of her and checked if she was alive and she wasn’t. I stabbed myself again with that knife and I just couldn’t do it hard enough to make it work. The next few days I was drinking and trying to do it at every night but I couldn’t do it.
*765 ¶ 16. Williams was indicted on March 2, 2006, by a Lafayette County grand jury on the sole charge of murder. He pleaded not guilty, and on September 24, 2007, he went to trial. The prosecution called nine witnesses. Three of those witnesses testified regarding Demetria’s personality, Williams’s personality, or the relationship between Demetria and Williams.
¶ 17. Jessica testified regarding Demet-ria’s personality, Demetria’s relationship with Williams, and the events that transpired during early November 2005. Demetria’s mother, Glenda Hill, also testified regarding Demetria’s personality and relationship with Williams. Enjoli Canan-kamp testified that, during the spring and early summer of 2005, she and Williams dated “off and on.” Canankamp also testified that she had spoken with Williams about Demetria’s death. According to Canankamp, Williams said that he and Demetria had a suicide pact.
¶ 18. The prosecution also called law enforcement witnesses who had participated in the investigation. Lieutenant Hatch-er testified as to his participation in the investigation, as did Investigator Williams and Agent Marsh, who had left the Mississippi Highway Patrol’s criminal investigation bureau and joined the Federal Bureau of Investigation. Dywana Broughton, an employee of the Mississippi Highway Patrol’s criminal investigation bureau’s crime scene unit, testified that she found twenty-three separate blood stains throughout Williams’s apartment.
¶ 19. Dr. Hayne, a forensic pathologist, also testified for the prosecution. Dr. Hayne testified that on November 16, 2005, some five days after Demetria’s death, he performed an autopsy on Demet-ria. Dr. Hayne testified that at the time he performed his autopsy, it was his belief that Demetria had been dead for approximately three days. According to Dr. Hayne, the cause of Demetria’s death was the stab wound to her heart. Dr. Hayne testified that the manner of her death was a homicide. Dr. Hayne went on to testify regarding why he did not believe that Demetria had committed suicide.
f 20. Dr. Hayne explained that he found bruises on the sternocleidomastoid muscles in Demetria’s neck, soft tissue hemorrhaging in her neck, and bruising in the area of Demetria’s larynx. Dr. Hayne opined that the injuries to Demetria’s neck were consistent with strangulation that was not self-inflicted, but was sustained while she was alive. Dr. Hayne also found an abrasion on Demetria’s right hand that he considered consistent with defensive posturing. Additionally, Dr. Hayne testified that “hesitation marks” are sometimes present when a person has committed suicide. “Hesitation marks” appear when one begins to commit suicide with a sharp object, but then hesitates to actually commit the mortal wound and instead slightly injures himself. Dr. Hayne found no hesitation marks on Demetria’s body. Finally, Dr. Hayne explained that it would take a “considerable” or “significant” amount of force to commit suicide by stabbing through the cartilaginous portion of the rib cage.
¶ 21. On cross-examination, Dr. Hayne testified that “hesitation marks” do not always appear when someone commits suicide with a sharp object. Additionally, he admitted that Demetria could have sustained the abrasion to her right hand in a number of ways other than defensive posturing. However, he opined that Demetria sustained the abrasion shortly before her death.
¶ 22. The prosecution’s final witness was Dr. Earnest Lykissi, an expert in the fields of clinical and forensic toxicology. Dr. Lykissi testified that, contrary to Williams’s claim that Demetria took ap *766 proximately ten Klonopin tablets before she died, there were no drugs detected in Demetria’s system. Dr. Lykissi testified that Demetria had a substantial amount of alcohol in her system. To be precise, Dr. Lykissi testified that Demetria’s blood-alcohol content was .6 percent. Dr. Lykissi explained that, when a person has a blood-alcohol content of .2, he or she is “commode hugging, floor crawling drunk.” He further explained that someone with a blood-alcohol content of .3 is likely to be unconscious, and a person with a blood-alcohol content of .4 is “ready for the undertaker.” According to Dr. Lykissi, some of the alcohol in Demetria’s system could have been attributed to decomposition, but only as much as .14 percent. Dr. Lykissi “seriously” doubted that anyone would be able to function with a blood-alcohol content of .3 or higher.
¶ 23. After the prosecution rested its case-in-chief, Williams called Dr. R.W. Scales. Dr. Scales testified that he has a Ph.D. in immunology and that he was the director and owner of Scales Biological Laboratory, a DNA testing facility in Brandon, Mississippi. According to Dr. Scales, almost all of the blood stains in Williams’s apartment were Williams’s blood. However, Demetria’s blood was found in the closet where she died, and in the left portion of Williams’s kitchen sink.
¶ 24. Williams called Father Ollie Rencher as a witness. Father Rencher was the Assistant Rector at St. Peter’s Episcopal Church in Oxford, which Demet-ria had attended. He was also the Episcopal Chaplain to the university. Father Rencher testified that he knew Demetria and that he had counseled her in religious matters. When Father Rencher first discovered that Demetria had died, he voluntarily contacted the Oxford Police Department and provided a statement in which he disclosed information about Demetria. In his statement, Father Rencher indicated that, from his personal knowledge about Demetria, he thought that she may have committed suicide. At trial, however, Father Rencher declined to testify regarding his statement based on the priest-penitent privilege.
¶ 25. Williams’s final witness was Dr. Arthur Copeland, a forensic pathologist with a doctoral degree in medicine and a Ph.D. in molecular biology. Dr. Copeland testified that he reviewed Dr. Hayne’s autopsy report and other records related to Demetria’s death. Dr. Copeland disagreed with Dr. Hayne’s conclusion that Demet-ria’s body demonstrated signs of manual strangulation. Dr. Copeland noted that Dr. Hayne did not perform a “fancy neck dissection” by which one dissects the tissues around the neck and takes photographs for a more detailed examination. Dr. Copeland testified that what Dr. Hayne concluded was hemorrhaging in the neck tissues could have simply been changes that occur with decomposition. Dr. Copeland further noted that manual strangulation produces “petechia,” which he described as “small minute pinpoint hemorrhages” that appear “[l]ike a little tiny dot.” Dr. Copeland went on to testify that there were no other indications of manual strangulation, such as broken fingernails or “offensive” injuries to Williams.
¶ 26. Dr. Copeland also criticized Dr. Hayne for not presenting his findings to another pathologist before he concluded that the manner of Demetria’s death was homicide. Additionally, Dr. Copeland stated that Dr. Hayne should have requested additional investigation into whether Dem-etria had a history of mental or emotional treatment and that he should have contacted a forensic psychologist or a forensic psychiatrist to discuss his findings.
¶ 27. Dr. Copeland explained that a lack of hesitation marks does not necessar *767 ily rule out the possibility that someone committed suicide. In contrast to Dr. Hayne’s testimony, Dr. Copeland testified that it is “not that difficult” to penetrate the cartilaginous portion of the rib cage. Dr. Copeland testified that he could not render a conclusion as to the manner of Demetria’s death, but his observations were “consistent with suicide.” Dr. Copeland went on to testify that Dr. Hayne “immediately jumped the gun [and] called this a homicide from the get[-]go.” On cross-examination, Dr. Copeland agreed that it is not typical for someone to commit suicide by stabbing herself with a knife. Dr. Copeland also testified that “[s]uicide among minority groups is rare.”[3]
¶ 28. After Dr. Copeland testified, Williams rested. During the conference on jury instructions, Williams requested an assisted-suicide instruction. The circuit court refused the instruction on the basis that assisted suicide is not a lesser-included offense of murder. As previously mentioned, the jury found Williams guilty of murder.
¶ 29. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1.Assisted-Suicide Instruction

¶ 30. Williams claims that the circuit court erred when it refused his proffered instruction designated as D-3, an assisted-suicide instruction. Instruction D-3 reads as follows:
If you find from the evidence in this case that the defendant, DAVID JACKSON WILLIAMS, is not guilty of the crime of murder, then you should continue with your deliberations' to consider the elements of the lesser crime of assisting suicide. Assisting suicide is the willful, or in any manner, advising, encouraging, abetting, or assisting of another person to take, or in taking, the latter’s life, or in attempting to take the latter’s life. If you find from the evidence in this case beyond a reasonable doubt that:
1. On or about November 13, 200[5][,] in Lafayette County, Mississippi;
2. That DEMETRIA BRACEY was a human being; and
3. That DAVID JACKSON WILLIAMS did willfully or in any manner, advise, encourage, abet or assist DEMETRIA BRACEY in taking her life;
then you shall find the defendant guilty of assisting suicide.
If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find DAVID JACKSON WILLIAMS not guilty of assisting suicide.
¶ 31. ' The circuit court refused
Williams’s proffered instruction on assisted suicide. According to Williams, he was entitled to an instruction on assisted suicide because it was his theory of the case, it arose from a common nucleus of operative facts, and assisted suicide is a lesser non-included offense of murder.
¶ 32. We are mindful that the circuit court “enjoys considerable discretion regarding the form and’ substance of jury instructions.” Marbra v. State, 904 So.2d 1169, 1178(1135) (Miss.Ct.App.2004). “All instructions are to be read together!,] and if the jury is fully and fairly instructed by other instructions!,] the refusal of any similar instruction does not constitute reversal error.” Id.
*768 ¶ 38. A Lafayette County grand jury charged Williams with murdering Demet-ria pursuant to Mississippi Code Annotated section 97-3-19(l)(a) (Rev.2006). Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the state penitentiary. Miss.Code Ann. § 97-3-21 (Rev.2006). Williams sought a lesser non-included instruction on assisted suicide. Mississippi Code Annotated section 97-3^49 (Rev.2006) provides:
A person who wilfully, or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter’s life, or in attempting to take the latter’s life, is guilty of [a] felony and, on conviction, shall be punished by imprisonment in the penitentiary not exceeding ten years, or by fine not exceeding one thousand dollars, and by imprisonment in the county jail not exceeding one year.
¶ 34. The circuit court refused Williams’s assisted-suicide instruction on the basis that Williams was only allowed an instruction on his theory of the case if that theory involved a lesser-included offense. However, beginning in 1988 and continuing thereafter, the Mississippi Supreme Court has consistently held that a defendant is entitled to an instruction on a lesser “non-included” charge, if justified by the evidence. Griffin v. State, 533 So.2d 444, 447-48 (Miss.1988). Our supreme court has recently reiterated that a defendant is entitled to a lesser non-included offense instruction under certain circumstances. Brooks v. State, 18 So.3d 833, 841 (¶36) (Miss.2009). The Mississippi Supreme Court has also held as follows:
The defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment. ... Therefore, if the evidence warrants it, a defendant is entitled to a lesser-offense instruction the same as he would be entitled to a lesser-included-offense instruction.
Moore v. State, 799 So.2d 89, 91(¶ 7) (Miss.2001) (quoting Gangl v. State, 539 So.2d 132, 136 (Miss.1989)) (emphasis added). Mississippi law clearly holds that a defendant is entitled to a lesser non-included offense instruction when the evidence at trial warrants such an instruction. However, we find that, in this case, there was no such evidence warranting an assisted-suicide instruction.
¶ 35. The dissent focuses on the existence of facts that may be consistent with a suicide or a suicide pact, but we respectfully find that those facts are not the proper focal point for determining whether Williams assisted Demetria to take, or in the taking of, her life. When the claim is assistance by another in effectuating a suicide, facts consistent with the commission of a suicide are irrelevant. It is axiomatical that many suicides are committed without any assistance. The dissent also focuses on matters that occurred between Williams and Demetria prior to Demetria’s death and erroneously categorizes those matters as acts of assistance or encouragement to Demetria to commit suicide. Assisting one in the commission of suicide requires action on the part of the assistor that leads directly to the physical act of terminating life. None of the actions taken by Williams fall in this category.
¶ 36. As already stated, Mississippi Code Annotated section 97-3-49, which defines the crime of assisting suicide, provides:
A person who wilfully, or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter’s life, or in attempting to take the *769 latter’s life, is guilty of [a] felony and, on conviction, shall be punished by imprisonment in the penitentiary not exceeding ten years, or by fíne not exceeding one thousand dollars, and imprisonment in the county jail not exceeding one year.
This section is commonly referred to as the assisted-suicide statute because it targets the actions of a person who assists another in the taking of the other’s life. This statute has no relevance when dealing with a suicide pact where two or more persons have taken their own lives without the aid of another.
¶ 37. In the case at bar, Williams did not testify, as was his constitutional right. Nevertheless, he contends that, at most, the evidence shows that he committed the offense of assisted suicide. The underpinning for his argument is the scripted statement that he gave to law enforcement officials. There are two reasons why we find that the statement was scripted: (1) Williams’s counsel was present when Williams gave the statement, and (2) during the initial portion of the interview, an unidentified person prompted Williams to include information that Williams had not included on his own. It is logical to conclude that the unidentified person is Williams’s attorney. After the prompt from the unidentified person, Williams made the following statement, which substantially forms the basis for Williams’s request for an assisted-suicide instruction:
We had kind of talked about committing suicide together and stuff like that and we decided we were going to do it last week and she came over, it was Sunday. We just hung out together, didn’t go to class, she didn’t work, um and we just hung out for a couple of days and decided that we were going to do it that night and she, we both drank a lot and took some pills but it wouldn’t help the pain, you know. And we decided to do it in the closet so it would take longer for people to find us if somebody showed up looking for us and we got knives and went in there and we decided to do it at the same time and mine didn’t go as far in.
Even a casual reading of this statement reveals that Williams did not claim to have advised, encouraged, abetted, or assisted Demetria to take or in the taking of her life. At most, the statement reveals that the two talked about committing suicide together. It may be that Williams encouraged or advised Demetria to commit suicide, but if so, that information is not contained in his statement. This Court is not warranted in reading more into the statement than is there. Had Williams truly believed that his only crime was assisting Demetria in the taking of her own life, he could have taken the stand and laid his theory before the jury. Of course, as stated, he was not constitutionally required to do so; however, since he did not give a more detailed statement, he cannot now legitimately claim that the evidence shows what it does not, even though, in reality, he may very well have encouraged or advised Demetria to commit suicide. By so finding, we do not suggest that Demetria took her own life; rather, we affirm the jury’s finding that Williams, in fact, murdered Demetria.
¶ 38. Later in the interview, Williams’s counsel, Jim Franks, began to question Williams for the purpose of eliciting what counsel deemed relevant but which Williams had not included. Counsel got involved after Investigator Marsh got ready to close the interview. At that point, the following exchange occurred:
Investigator Marsh: All right, to make sure I have got this right. I repeat stuff sometimes because that is how I remember it. Everybody has their *770 own way. So y’all were pretty drunk and on pills. Y’all laid down and said I love you to each other and that is when you cut yourself and she had stabbed herself. Did you feel her moving at all or anything like that?
Williams: I don’t remember.
Investigator Marsh: You don’t remember that? Okay. All right. Is there anything, anything that I should have asked and didn’t, anything else that you can think of that....
[Franks]: I have a couple of things to tell y’all about.
Investigator Marsh: Sure.
At this point, Franks began questioning Williams. We quote verbatim from the transcript of the interview:
[Franks]: Uh, first off, about 6 weeks ago and you were at home and the Olive Branch Police came here. Can you tell them about that?
Williams: I was talking to Demetria on the phone and I was acting really suicidal and was scared that I was going to go ahead and do it and she tried to get me to stop and I didn’t want to. She invited a friend over to talk to and she asked what to do. She called UPD.
Investigator Marsh: Who was her friend?
Williams: I don’t know. I just heard about it.
[Franks]: Why do you think she would get him to call you?
Williams: I mean, he just called....
[Franks]: Why do you think that she had somebody to call the police department and say that you were going to commit suicide?
Williams: I’m not sure why.
[Franks]: Okay. Uh, the day, the Thursday that all of this happened, Thursday leading into Friday, tell them about going to the bank.
Williams: She wanted to go to the bank and get her money out and put it in her purse so that her mom could get it. She said she wasn’t sure that she could get access to the account. So we went by the bank and took out all of her money out. I don’t know exactly how much it was.
[Franks]: It was an ATM?
Williams: Yes, it was an ATM.
[Franks]: And which bank was that?
Williams: Trustmark on West Jackson.
[Franks]: That was Friday?
Williams: Yes, that was Friday.
[Franks]: And who put the card in?
Williams: I did that. She told me the pin number and I punched it in. She searched on the [I]nternet to see how much to get because she didn’t know what her balance was so she got pretty much all of it, I think. She told me how much it was, I don’t remember.
[Franks]: Okay. Who wound up with the money?
Williams: She did. She just put it in her purse somewhere, in like a little coin purse thing. She put it in there.
[Franks]: Was the money still there when you left?
Williams: It should be, yeah.
[Franks]: Okay. Now, tell them about the phone call that you received from Jessica Smith.
Williams: Jessica had been trying to call um, Demetria on her cell phone and she had turned it off because she didn’t want anybody to know where she was and she called me and I thought I should answer and do something. Because she said she was worried about where she is, that she had been missing work and not going to band and all that so, I decided to tell *771 her that she had gone down to her dad’s house and I said that her dad didn’t want her number given out so I did the three way calling. I told her to turn her cell phone on real quick and she turned it on. I did a three way call to Demetria’s cell phone and she answered and she said that she was down at her dad’s place and that her dad wasn’t doing too good.
[Franks]: Okay. When was this?
Williams: I think it was um, Thursday or Wednesday.
[Franks]: Wednesday or Thursday?
Williams: Yeah.
* * * * * *
Detective Williams: You said, let me verify this. You stated that Demetria wanted to take her money out of her account to make sure that her mother got the money is [sic] she went through with the suicide.
Williams: Right?
Detective Williams: And actually killed herself and said her mother would get the money and cut through all the red tape from having to go through the banking system to get the money.
Williams: Right. I don’t know if she could get access to it through the bank, the account. I think it was tied through her school account somehow. I don’t know if she could get access to it.
Detective Williams: But you are the one that took the money out?
Williams: Right. Basically it was her idea. She wanted to do it.
¶ 39. As the above colloquy shows, the only actions taken by Williams were (1) driving Demetria to the bank so that Dem-etria could withdraw most of her money, (2) punching in the PIN that Demetria had given him, and (3) answering a telephone call and telling an unsolicited lie about Demetria’s whereabouts. We cannot see how these actions constitute advising, encouraging, abetting, or assisting in the taking of Demetria’s life within the meaning of section 97-3-49, as that section targets actions calculated to effectuate the death of another. For thoroughness’s sake, we will discuss each action in turn.
¶ 40. First, it is important that Williams does not say that Demetria asked him to take her to the bank or that he advised her to remove the money to make it easier for her mother to get after Demetria’s death. According to Williams, it was Demetria’s idea, without any coaching or encouragement from him. Even if he had advised or encouraged her to withdraw her money from the bank, we would still find that action insufficient to constitute assistance within the meaning of the assisted-suicide statute, because neither of those actions was advice regarding or encouragement to commit suicide, and they certainly were not actions that led to, or assisted in, the physical death of Demetria.
¶ 41. The matter of the telephone call with Jessica does not fare any better with respect to satisfying the requirements for assisted suicide. Again, according to Williams’s statement, preventing Jessica from learning the truth of what was going on was his idea. It was Williams, without any coaching from Demetria, who decided to lie about Demetria’s whereabouts. There is no evidence that Demetria needed or asked for his assistance in this regard. In fact, according to Williams, Demetria had turned her cellular telephone off and was not answering any calls. It was Williams who decided to answer the telephone and engage Jessica in conversation. It was Williams who told Demetria to turn her cellular telephone on. Rather than advising, encouraging, assisting, or abetting Demetria to take her life, these actions look more like an attempt to create a ruse *772 in hopes of delaying the discovery of what Williams was planning to do. When this conversation occurred, Demetria was not in the process of taking her life. Unsolicited help by Williams in creating a situation where Demetria chose to lie about her whereabouts is not advising, assisting, encouraging, or abetting Demetria to take her life. If she had already turned her telephone off, she apparently was content with letting people, including Jessica, think what they wanted to about her unavailability.
¶ 42. We return to Williams’s statement before his counsel got involved in the questioning process. As noted, Williams said that he and Demetria had talked over the summer about committing suicide together. It is important that he did not give any details regarding the conversations that they had. We do not know, for example, whether Demetria was reluctant to do so, and he convinced her to do it. How then can it be said that he advised, encouraged, or assisted her to commit suicide? Because suicide carries a tremendous social stigma, it is tempting to assume that if two lovers decide to commit suicide, one of them has to advise or encourage the other to do so. That may be the case in some instances, but that is by no means a logical inference that an appellate court may take notice of in determining whether there is sufficient evidence to entitle a defendant to an instruction on assisted suicide, especially when assisted suicide is not the charged offense. The law is well settled in this state that a jury is entitled to draw all reasonable inferences from the evidence that supports a verdict of guilty or not guilty of the charged offense. However, we know of no jurisprudence that authorizes an appellate court, in determining whether an instruction was properly denied, to speculate regarding actions that the proponent of the instruction may have taken that would justify granting the instruction. This is especially true where the evidentiary basis for the instruction is dependent upon some overt action on the part of the defendant. There must be a showing from the evidence that the overt action was taken. In this case, there must be a showing that Williams provided some advice, encouragement, or assistance to Demetria that caused or helped her to commit the physical act of taking her own life. There is no such showing in the record.
¶ 43. Finally, we find little persuasion in the fact that Demetria’s death occurred in Williams’s apartment after she and Williams had “hung out” in his apartment for several days, where they engaged in a drinking binge. There is little doubt that this occurred, as numerous beer cans were found in the apartment. We simply do not find this fact helpful or relevant to the resolution of the issue that is before us. We must respectfully disagree with the dissent’s apparent conclusion that this activity in some way constitutes advising, encouraging, or assisting Demetria to commit suicide, especially when there is no evidence that she stated or, in any way, intimated or suggested that she needed to get drunk to commit suicide. The evidence is undisputed that she and Williams were lovers. We cannot find that two lovers sharing a weekend together and engaging in excessive drinking is evidence that one them is advising, encouraging, or assisting the other to commit suicide. Again, this is especially true when there is no evidence of what was said during the ordeal by the one who is found dead after the drinking had ended. We also note that scientific evidence completely refutes part of what Williams said occurred, as he stated that he and Demetria equally shared twenty pills that belonged to him. The toxicology report proves that Williams lied *773 about the pills, because none were found in Demetria’s system.
¶ 44. We find that the circuit court did not err in denying the assisted-suicide instruction. However, his reasoning for denying the instruction does not find support in the jurisprudence of this state. While the circuit judge correctly held that assisted suicide is not a lesser-included offense of murder, that is not a prerequisite for granting a lesser, non-included-offense instruction such as was requested here. Our supreme court has held that a defendant is entitled to a lesser non-included-offense instruction for a non-indicted offense if the non-indicted offense arises out of a common nucleus of operative facts with the indicted offense. Delashmit v. State, 991 So.2d 1215, 1221 (¶ 18) (Miss.2008) (citing Green v. State, 884 So.2d 733, 737(¶ 11) (Miss.2004)). But this entitlement is circumscribed by the familiar evidentiary requirement of the existence of a factual basis that supports the granting of the instruction. Id. (citing Griffin, 533 So.2d at 447). Here, the evidence does not support the granting of an assisted-suicide instruction. Therefore, we affirm the decision of the circuit judge on the basis that the requested instruction lacks evidentiary support in the record, as an appellate court is authorized to affirm a decision of a trial judge if the judge reached the right result, although for the wrong reason. Green v. Cleary Water, Sewer & Fire Dist., 17 So.3d 559, 572(¶ 42) (Miss.2009) (citing Cucos, Inc. v. McDaniel, 938 So.2d 238, 247(¶ 26) (Miss.2006)).

2. Priest-Penitent Privilege

¶ 45. In this issue, Williams claims the circuit court committed reversible error when it allowed Father Reneher to refuse to testify to certain matters pursuant to the priest-penitent privilege. We are mindful of our standard of review. We review “the trial court’s decision to admit or exclude evidence under an abuse of discretion standard of review.” Valmain v. State, 5 So.3d 1079, 1082(¶9) (Miss.2009). “Where such error is found, this Court ‘will not reverse unless the error adversely affects a substantial right of a party.’” Tate v. State, 912 So.2d 919, 924(¶ 9) (Miss.2005) (quoting Ladnier v. State, 878 So.2d 926, 933(¶ 27) (Miss.2004)).
¶ 46. As previously mentioned, after Father Reneher discovered that Demetria had died, he voluntarily contacted the Oxford Police Department and gave a statement. Williams sought to have Father Reneher' testify regarding that statement. Williams argued that Father Reneher waived the priest-penitent privilege when he gave his statement. Outside of the jury’s presence, the circuit court allowed Father Rencher’s attorney and the “Vice Chancellor of the Episcopal Diocese of Mississippi,” Wayne Drinkwater, to advance his position that Father Reneher lacked the authority to waive the privilege on Demetria’s behalf. The circuit court agreed and held that Father Reneher could not waive the privilege because the privilege belonged to Demetria or her personal representative. The circuit court then held that Father Reneher could claim the privilege on a question-by-question basis.
¶ 47. In the presence of the jury, Father Reneher testified regarding his background and how he came to know Demetria. After some brief introductory questions, Williams’s attorney asked Father Reneher whether he remembered seeing Demetria on Good Friday 2005. Father Reneher responded affirmatively. Williams’s attorney then asked Father Reneher whether he advised her “to seek medication” at that time. Father Rencher responded, “I’m not comfortable with *774 this.” At that time, the circuit court sent the jury out of the courtroom.
¶ 48. Outside of the jury’s presence, the circuit court asked Father Rencher whether he was of the opinion that his response would be subject to the priest-penitent privilege. The following exchange then transpired:
A. I do. We did not have a confidential conversation on that day. I did see her that day as do many people pass through [sic] the church property on that day but we did not have any sort of counseling as it were as Priest Penitent like other people who made their confession on that day in a Priest Privilege way.
Q. But you did advise her to seek medication on that day did you not?
A. When I saw her in passing she was very anxious as she had been on occasion and I asked her[, “]are you seeing a counselor^’] and she said she was at times and I said[, “]I hope that that continues to improve. [”]
Q. But that doesn’t answer my question. I asked if you told her, let me quote you.... Did you state to the investigator Mr. Moore[, “]I think I even asked her are you taking medication and she said no, I’m not. I said, you might look into it.[”]
A. That sounds like something I would have said based on that moment, yes.
BY MR. FRANKS: And, judge, I did not ask him what she said to him and the [R]ule 505 says it applies to confidential communication by the person to a clergy man. [sic]
BY THE COURT: Did this occur at the church let me ask you that question, were you at the church[?]
A. In a hallway at the church.
BY THE COURT: I’m going to allow the witness not to answer that question any further and instruct you not to ask him about it in the presence of the jury as falling within the confidential relationship.
¶ 49. The circuit court then allowed Williams’s attorney to proffer any additional testimony from Father Rencher to determine whether that testimony would also be privileged. Williams’s attorney asked whether Demetria ever told Father Rencher that she had considered committing suicide “in circumstances that did not involve religious counseling.” Father Rencher responded, “[n]o.” Next, Williams’s attorney asked, “[d]id she advise you at any time that she had considered suicide?” Father Rencher answered, “I cannot under privilege disclose that.” The circuit court allowed Father Rencher to claim the privilege.
¶ 50. Father Rencher went on to testify that he had advised Demetria to “go to counseling services,” and that Demetria appeared “stressed out” when he spoke to her on Good Friday 2005. When asked whether that was the same time that he advised Demetria to “seek medication,” Father Rencher testified that he said he “hoped she would get some help.” Williams’s attorney again asked whether Father Rencher advised Demetria to seek medication. Father Rencher answered: “It is possible as I stood there and we all say get some help. Be on meds. It was very loosely said but not in the way as a professional, no.” At that time, the circuit court stated, “[h]e said she looked stressed out[;] that is observation [sic] that he made. The rest of it took place at the church on Good Friday!,] and I believe it falls within that confidential relationship.”
¶ 51. The final line of questioning during the proffer involved Father Rencher’s *775 opinion of Demetria’s self-esteem. Father Rencher testified that, in his opinion, he would describe Demetria as having low self-esteem “[o]n occasion.” Father Rencher also testified that he said that Demetria “was clearly in a controlling situation [regarding her relationship with Williams] mixed with her self[-]esteem being low [and] that there was a cloud of uncertainty that hung over [Demetria].” Williams’s attorney then stated that he had no additional questions for Father Rencher.
¶ 52. Williams claims the circuit court committed reversible error when it did not allow Father Rencher to be questioned regarding his entire statement. The record does not indicate that Williams proffered a transcript of Father Rencher’s statement to the Oxford Police Department.[4] Additionally, Father Rencher’s statement is not listed among the exhibits. However, a transcript of Father Rencher’s statement appears in Williams’s record excerpts. Merely including the statement in the record excerpts when it was not introduced at trial does not place the statement “in the record.” Qualls v. State, 947 So.2d 365, 370(¶ 12) (Miss.Ct.App.2007). Because Williams did not question Father Rencher on every topic and occurrence that was discussed in Father Rencher’s statement, we address only those matters that were discussed during Williams’s trial and the proffer of Father Rencher’s testimony. Additionally, we address only those matters that the circuit court considered subject to the priest-penitent privilege.
¶ 53. “A person has a privilege to refuse to disclose and prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.” M.R.E. 505(b). The circuit court allowed Father Rencher to claim the privilege regarding two lines of questioning: (1) the events that transpired on Good Friday 2005, including whether Father Rencher advised Demetria to seek medication at that time; and (2) whether Demetria had ever mentioned to Father Rencher that she had considered committing suicide. We address each line of questioning in turn.

a. Good Friday 2005

¶ 54. Williams claims that the circuit court erred when it allowed Father Rencher to claim the priest-penitent privilege regarding his encounter with Demet-ria on Good Friday 2005. According to Williams, Father Rencher could not claim the privilege because nothing about their encounter was confidential. We disagree, but also find that, even if the encounter was not confidential, any error in allowing Father Rencher to use the priest-penitent privilege was harmless at worst.
¶ 55. As previously mentioned, one of the qualifiers for operation of the privilege is that a communication must be confidential. M.R.E. 505(b). Pursuant to Mississippi Rule of Evidence 505(a)(2), “[a] communication is ‘confidential’ if made privately and not intended for further disclosure except in furtherance of the purpose of the communication.” During the proffer, Father Rencher was asked about the events that transpired on *776 Good Friday 2005. Father Reneher testified that he encountered Demetria in a hallway at the church. Additionally, he expressly stated that “[w]e did not have a confidential conversation on that day.” Despite Father Rencher’s statement, we find that the circuit court was entitled to find that the conversation was confidential based on the circumstances under which it occurred. Namely, Demetria sought the advice and counseling of a priest at her church, and she did so after Good Friday services while still at church. However, even if we were to accept Father Rencher’s characterization of his encounter with Demetria on Good Friday 2005, we find that any error in allowing Father Reneher to claim the privilege regarding his conversation with Demetria was harmless.
¶ 56. This Court will not reverse a circuit court’s decision regarding the admissibility of evidence unless the circuit court’s abuse of discretion was “prejudicial to the accused.” Hughes v. State, 735 So.2d 238, 270 (¶ 134) (Miss.1999). Nothing in the proffer of Father Rencher’s testimony indicated that Demetria mentioned suicidal thoughts during her encounter with Father Reneher on Good Friday 2005. Father Reneher merely stated that Demetria appeared “stressed out” at that time. Based on that observation, Father Rencher advised Demetria to seek counseling and medical treatment, including the possibility of prescription medication. That evidence did not tend to prove that it was more likely that Demetria committed suicide more than six months later. We find that, based on the record at trial, Williams was not prejudiced by the circuit court's decision to allow Father Reneher to claim the priest-penitent privilege regarding the events that transpired on Good Friday 2005. Accordingly, any error in allowing Father Reneher to claim the priest-penitent privilege was harmless.

b. Whether Demetria had Ever Considered Suicide

¶ 57. Williams’s attorney asked Father Reneher whether Demetria had ever advised him “at any time that she had considered suicide.” Father Reneher answered, “I cannot under privilege disclose that.” During the proffer, Williams’s attorney did not ask Father Reneher any follow-up questions regarding whether Demetria had ever mentioned suicidal thoughts. Presumably, Demetria had mentioned suicidal thoughts at some point, and Father Rencher considered that discussion to be covered by the privilege. However, the record does not contain any details regarding the circumstances of that discussion. Accordingly, we cannot determine whether that discussion was confidential or whether it took place while Father Reneher was acting in his “professional character as a spiritual adviser” at the time. It is the appellant’s duty to provide an adequate record on appeal. Juarez v. State, 965 So.2d 1061, 1065(¶ 12) (Miss.2007) (citing Acker v. State, 797 So.2d 966, 971(¶ 19) (Miss.2001)). Moreover, we “must decide each case by the facts shown in the record, not assertions in the brief.... Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them.” Beamon v. State, 9 So.3d 376, 379(¶ 10) (Miss.2009) (quoting Mason v. State, 440 So.2d 318, 319 (Miss.1983)). Because Williams did not fulfill that obligation, we find no merit to his contention of error.

3. Expert Testimony

¶ 58. Williams claims the circuit court erred when it allowed Dr. Hayne to testify as an expert witness. As there was no objection to Dr. Hayne’s testimony at trial, any error in allowing his testimony must rise to the level of plain error. *777 Williams bases his claim largely on Justice Diaz’s concurring opinion in Edmonds v. State, 955 So.2d 787, 802 (¶ ¶ 44-45) (Miss.2007). In Edmonds, Justice Diaz attacked Dr. Hayne’s qualifications to testify because Dr. Hayne was not certified in forensic pathology by the American Board of Pathology. Regardless, a majority of the Edmonds court found that Dr. Hayne was certified to testify as an expert in forensic pathology. Id. at 792(¶ 8). Therefore, we find no merit to the contention that Dr. Hayne was not properly certified to testify as an expert in forensic pathology.
¶ 59. Williams also contends that his own expert refuted the propriety of the procedures used by Dr. Hayne in conducting his autopsy and coming to his conclusions regarding Demetria’s death. Dr. Hayne testified that there were four reasons that led him to exclude suicide as the manner of Demetria’s death: (1) the angle and depth of the fatal wound, (2) the presence of injuries to Demetria’s neck, (3) the absence of “hesitation” marks, and (4) the abrasion on the back of Demetria’s hand. We review each of these conclusions. In so doing, we reiterate several facts that have already been related in this opinion.*
¶ 60. Although Dr. Hayne testified that the angle and the depth of the fatal wound were inconsistent with suicide, Dr. Copeland contradicted Dr. Hayne’s conclusion. As for the angle of the fatal wound, according to Dr. Copeland, the angle was “consistent with suicide.” Dr. Copeland testified that “a person could take a knife themselves [sic] and inflict it into their body this way.” Dr. Hayne’s inclusion of the depth of the fatal wound seems to have been linked to the force required to inflict that wound. Dr. Hayne testified that it would have taken “considerable” or “significant” force to cause the injury that killed Demetria. Dr. Copeland contradicted Dr. Hayne’s characterization of the force required to inflict the fatal wound. Dr. Copeland noted that the fatal wound did not go through bone. Instead, the fatal wound passed through the “cartilaginous” tissue between Demetria’s ribs. Dr. Copeland elaborated that such tissue is “not all that difficult for a knife to get into.” Dr. Copeland further testified that such tissue is “not all that difficult to penetrate.”
¶ 61. As for the small injuries to Dem-etria’s neck, as previously mentioned, Dr. Hayne testified that he found bruises on the sternocleidomastoid muscles in Demet-ria’s neck as well as soft tissue hemorrhaging in her neck and bruising in the area of her larynx. Dr. Hayne opined that the injuries to Demetria’s neck were consistent with strangulation that was not self-inflicted, but was sustained while she was alive. However, Dr. Copeland vigorously contradicted Dr. Hayne’s findings. Dr. Copeland testified that he reviewed Dr. Hayne’s autopsy report and that he disagreed with Dr. Hayne’s conclusion regarding the suggestion of manual strangulation. Dr. Copeland testified that Dr. Hayne failed to dissect the tissues around Demetria’s neck. Dr. Copeland also testified that what Dr. Hayne concluded was hemorrhaging could have been changes that occur with decomposition. Dr. Copeland further noted the absence of other indications of strangulation, such as “petechia,” which he described as “small minute pinpoint hemorrhages” that appear “[l]ike a little tiny dot.” Dr. Copeland went on to testify that there were no other indications of manual strangulation, such as Demetria having broken fingernails or “offensive” injuries suffered by Williams. According to Dr. Copeland, the evidence that Dr. Hayne attributes to strangulation was likely caused by decomposition.
¶ 62. As for the third basis for Dr. Hayne’s conclusion regarding the manner of Demetria’s death, Dr. Hayne noted that *778 the absence of “hesitation” marks on Dem-etria’s body contradicted the possibility that she committed suicide. However, on cross-examination, Dr. Hayne testified that hesitation marks do not always accompany deaths by suicide. Dr. Copeland also testified that the lack of hesitation marks did not rule out the possibility of suicide as the manner of Demetria’s death.
¶ 63. Finally, as stated, Dr. Hayne testified that the presence of an “abrasion” on the back of one of Demetria’s hands could have been a defensive wound, meaning a wound that one sustains while defending against an attack. However, Dr. Hayne also testified that the abrasion injury to the back of one of Demetria’s hands was not necessarily a defensive wound — it was only consistent with a defensive wound. Dr. Copeland testified that Demetria could have sustained the abrasion in other ways aside from defending herself from Williams.
¶ 64. “[U]nder the plain-error doctrine, [an appellate court] can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant’s ‘fundamental, substantive right.’ ” Neal v. State, 15 So.3d 388, 403(¶ 32) (Miss.2009) (quoting Smith v. State, 986 So.2d 290, 294(¶ 10) (Miss.2008)). To prove plain error, a defendant must show an error that “seriously” affected “the fairness, integrity or public reputation of judicial proceedings.” Id. (citing United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).
¶ 65. We do not find that allowing Dr. Hayne’s testimony affected the “fairness, integrity, or public reputation” of Williams’s trial. From the record, it appears that Dr. Hayne and Dr. Copeland merely disagreed regarding methodology and conclusions. As the jury heard testimony from both doctors, there is no merit to any contention that Dr. Copeland’s testimony invalidated Dr. Hayne’s testimony.
¶ 66. This contention of error is without merit.

Speedy Trial

¶ 67. Williams was arrested on November 17, 2005. He was indicted on March 2, 2006. He waived arraignment the same day. On July 24, 2007, the circuit court entered an order setting Williams’s trial date for September 24, 2007.
¶ 68. Five days before his trial, Williams filed a “motion to dismiss for violation of [the] 270-day rule.” Within that motion, Williams claimed that the circuit court should dismiss the indictment against him because the State failed to try him within 270 days of the date he waived arraignment. Williams’s motion was based solely on Mississippi Code Annotated section 99-17-1 (Rev.2007). Williams did not raise his constitutional right to a speedy trial.
¶ 69. On the day of trial, after jury selection, the parties met in the circuit judge’s chambers. The circuit judge subsequently denied Williams’s motion to dismiss. Williams went to trial approximately 571 days from the date that he waived arraignment. According to Williams, the circuit judge erred when he denied the motion to dismiss.

a. Constitutional Right

¶ 70. As previously mentioned, Williams’s motion to dismiss was based solely on his statutory right to a speedy trial. Williams did not raise his constitutional right to a speedy trial. In his brief on appeal, however, Williams appears to invoke his constitutional right to a speedy trial in noting that “[a] defendant is guaranteed the right to a speedy trial according to the Sixth Amendment of the United States Constitution, as well as [Article 3, *779 Section 26 of] the Mississippi State Constitution.” In addressing similar circumstances, this Court has held as follows:
We agree with the suggestion of the United States Supreme Court that not every defendant, though entitled under the constitution to a speedy trial, is anxious to have that right vindicated. See Barker v. Wingo, 407 U.S. 514, 521, 92 S.Ct. 2182, 38 L.Ed.2d 101 (1972). As the Supreme Court observed, a defendant may be perfectly content to endure multiple and prolonged delays in bringing his case to trial. Id. The defendant may be in hopes that time will result in the unavailability of potential witnesses, will cloud the memory of those still available, will result in the loss of other available evidence, or will simply remove some of the urgency from the facts so that jurors may take a more benign view of the matter. We conclude, therefore, that [the] failure to affirmatively raise the issue at the trial level works as a bar to our consideration of the issue on appeal under the well-known principle that the primary purpose of an appellate court is to correct erroneous rulings by the trial court and not to rule on alleged errors that were not presented to the trial court for decision in the first instance. Sanders v. State, 678 So.2d 663, 670-71 (Miss.1996). Because delays in bringing a matter to trial may work to the defendant’s advantage, we do not consider a claim that the defendant was denied a speedy trial to be a matter of plain error or fundamental error that may be raised for the first time on appeal. Therefore, we find ... this issue to be proeedurally barred.
Bell v. State, 733 So.2d 372, 376(¶ 11) (Miss.Ct.App.1999). Accordingly, we find that Williams is proeedurally barred from raising his constitutional right to a speedy trial for the first time on appeal.

b. Statutory Right

¶ 71. Mississippi Code Annotated section 99-17-1 provides that “[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.” “However, we have held that if a defendant fails to raise the statutory fight to a speedy trial within 270 days of his arraignment, he acquiesces to the delay.” Roach v. State, 938 So.2d 863, 867(¶ 9) (Miss.Ct.App.2006). Williams filed his motion to dismiss 566 days after he waived arraignment. Accordingly, Williams “waived his right to complain about not being tried within 270 days, because he neither requested nor asserted his right to a speedy trial” within that time. Guice v. State, 952 So.2d 129, 140(¶ 23) (Miss.2007). We find no merit to this issue.

5. Ineffective Assistance of Counsel

¶ 72. Williams claims that he received ineffective assistance of counsel. Williams asserts that his counsel was deficient in several respects, namely in: (1) not moving for a change of venue, (2) not calling Michael Presnell as a witness, (3) not introducing a transcript of an online chat between Williams and Demetria, (4) failing to obtain Demetria’s mental health or prescription records, (5) failing to object to the admission of a death certificate into evidence, and (6) failing to further develop Williams’s medical history in support of Williams’s defense. We will address each of these in turn.
¶ 73. There is a two-part test that must be used to determine whether counsel is ineffective:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made *780 errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Doss v. State, 19 So.3d 690, 694-95(¶ 7) (Miss.2009) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

a. Motion for Change of Venue

¶ 74. Williams claims that his attorney should have moved for a change of venue because of the “abundance of pretrial publicity regarding the case.” During voir dire, three potential jurors indicated that they had heard or read something about the case that might influence their opinions. The circuit court dismissed all three jurors after questioning them about their abilities to set aside what they had heard or read. On April 14, 2008, at a posttrial hearing on Williams’s motion for a new trial, Franks, Williams’s trial counsel, testified regarding his reasons for doing or not doing certain things during his representation of Williams. Regarding a change of venue, Franks testified that a “[cjhange of venue was discussed with the defendant as well as his family at my office well in advance of trial.” Franks went on to testify that he thought that jury panels in Oxford tend to be: more educated, more liberal, and less likely to judge someone for being involved in a romantic interracial relationship. Franks stated that Williams and his family “expressed no objection to handling it that way....”
¶ 75. “There is a strong but rebuttable presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Neal, 15 So.3d at 405(¶ 40) (quoting Holly v. State, 716 So.2d 979, 989(¶ 37) (Miss.1998)). Here, counsel gave numerous reasons for his decision to not request a transfer of venue. Furthermore, he stated that he discussed that strategy with Williams and his family. Williams failed to show that his counsel was deficient for not requesting a change of venue.

b. Presnell

¶ 76. Franks was also questioned about his failure to call Presnell as a witness and his reasons for not doing so. We quote from his response at length:
Michael Presnell gave a statement to a police officer ... that was kind of antagonistic toward David on a personal level; but it did add something of value to us, which was that about two years prior[,] Demetria had confided in him that she had considered suicide. We have a remoteness issue there, but we would have . been dealing with that had I been able to call him.
We were not able to find Michael Pres-nell. We did an [Ijnternet search looking for him, could not find him. The Thursday before trial[,] David’s father contacted me and told me that he thought there was some evidence on the 911 tape which had been made to Olive Branch about a month or so prior to Demetria’s death when David had attempted suicide in Olive [Bjranch a previous time.
... I went over and reviewed the 911 tape; and there was nothing of value on that tape except we found a phone number, a cell phone number, from Michael Presnell where he had called 911.
This was on the Thursday before the trial. We called that number. I called that number and was never able to receive an answer and was not able to leave a voice message.
*781 On Tuesday of the trial the first witness that the State called was a Jessica Smith, who was friends of the various participants in this. During the course of my cross-examination of her, I asked her if she knew where Michael Presnell was. She said, Yes, he is back at school; and this was, as you will recall, shortly after the school year had begun again.
She said he is back at school. He is in the engineering department, and she said that he [sic] had seen him the previous week.
I discussed that later that afternoon after we had broken [sic] with Charles Williams, David’s father; and Charlie said that he had a friend, who I knew, and I’ve forgotten first name [sic], San-dridge, who used to be a detective with [the] DeSoto County Sheriffs Department; and Charlie said between him and Mr. Sandridge, that they would be able to find Michael Presnell over that night, which would have been Tuesday night and on into Wednesday morning.
When we came back on Wednesday morning, Charlie said something to the effect that we do not need him as a witness; and which I thought was odd; but I didn’t ask him why.
At any rate[,] he had not found Presnell; or if he had, he did not want to bring him forward as a witness.
In other words, Franks had relied on Williams’s father’s assertion that Presnell would not be useful as a witness. Additionally, as far as Franks knew, the only evidence that Presnell could offer that might be of any use to Williams was that Demetria had contemplated suicide a significant period of time before her death. During cross-examination, Franks testified that the sheriffs department had subpoenas for Presnell, but was unable to locate him.
¶ 77. Williams’s father also testified at the posttrial hearing. Regarding Presnell, Williams’s father testified that he “was able to find an address for [Presnell], the street address. That was all, but not able to find him at that time.” Williams’s father went on to testify about how he found Presnell approximately two weeks after the trial. Williams’s father testified that he met with Presnell at that time, although he did not testify about anything that Presnell might have testified to in Williams’s defense. Under all the circumstances, Williams has failed to show that his trial counsel was deficient. He has further failed to show that any deficiency prejudiced his case. Despite contacting Presnell after trial, there was no evidence to show that Presnell had anything to contribute to Williams’s case.
c. Introduction of Online Chat Transcript
¶ 78. The transcript of the online chat at issue contained a statement by Williams that he was going to kill himself, and a response by Demetria that when she thought that he had killed himself, she wanted to kill herself as well. The transcript shows that Williams then invited Demetria over to commit ’ suicide, and Demetria responded that she could not do that. Demetria did not expound on why she could not join Williams at that time. Franks testified that he did not introduce the online chat transcript because:
What she says in this is that she could not kill herself. It does at least imply, I think fairly specifically implies that there was a, that it was discussed, the suicide was discussed; but she specifically says, I cannot do that; and my concern was if you bring this in, I think it really is [a] double-edged sword; and I think it cuts more against the defendant than it does ... against the State.
*782 Franks testified that he discussed whether to introduce this transcript with Williams and Williams’s family. Based on all the evidence, we cannot find that Franks was deficient in not introducing the online chat transcript.

d.Failure to Obtain Demetria’s Mental Health Records

¶ 79. Franks provided the following explanation for why he did not seek out any of Demetria’s medical records:
Sometime prior, a couple of months pri- or to trial[,] David Williams’s family paid me ... money for a forensic pathologist and a private investigator. During the course of my investigation, there came to light no indication that Demetria had any type of psychiatric treatment. The most telling example of this was the defendant, who said to his knowledge she had no psychiatric treatment and had not been on any medication. He was the [sic] probably the closest person to her other than perhaps her mother who later on the witness stand testified that she had not been under any psychiatric treatment or under in my [sic] medication.
That being said, I discussed with David and with the family that our money was better spent bringing in the forensic pathologist where we actually had a doctor who was saying that Steven Hayne, the medical examiner, was wrong.
I felt like it was better to spend that money on that forensic pathologist than hiring an investigator to do what appeared to be a wild goose chase. I discussed that with the family. The family agreed with that, and we moved on. When I say the family, the family and the defendant.
There is no merit to Williams’s contention that his trial counsel was deficient for failing to seek out Demetria’s medical records. To date, no medical records have been produced; therefore, there is also no showing that the records would have provided anything of use to Williams.
e. Admission of Death Certificate
¶ 80. Although Williams asserts that his counsel erred in allowing a death certificate to be admitted, Franks testified that he could not recall a death certificate being admitted into evidence. He testified that he reviewed a list of exhibits in the case, but that he still could not find where a death certificate had been entered into evidence. This Court has also searched the record, including the exhibits provided on appeal as well as the lists of exhibits provided in the record. Having done so, we have not found any indication that a death certificate was entered into evidence. Therefore, this contention of error is without merit.

f. Admission of Williams’s Medical Records

¶ 81. Franks explained his reason for not further developing evidence of Williams’s medical history:
We had the defendant’s medical records with us. I am the attorney for Baptist DeSoto who held those records. If we had needed to introduce them into evidence, all I would have to have done is call the supervisor at Baptist and tell him to send their records person down[,] and we could have introduced it.
I don’t know what his extensive medical history would have added to the suicide defense. It wasn’t about, his medical history had nothing to do with her medical history. It’s not an issue of insanity on his part, and there didn’t seem to be any serious suggestion that David’s five suicide attempts were anything other than legitimate suicide attempts, so that one I’m a little lost on what was being suggested that we should have done. *783 I brought in the evidence throughout the course of this. I brought in the evidence I thought was most favorable to David. I presented it in the light most favorable to David, and that’s what you do in a criminal trial.
This Court agrees with Williams’s trial counsel. The issue at trial was whether Williams killed Demetria. To date, nothing has been introduced to show what Williams’s medical records would have shown in his defense. Given the facts in this case, this contention of ineffectiveness of counsel is also without merit.
¶ 82. THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., BARNES, ISHEE AND CARLTON, JJ„ CONCUR. KING, C.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. MAXWELL, J., NOT PARTICIPATING.

. Williams was also a student at the University of Mississippi.

. An autopsy revealed that the kitchen knife penetrated between five and six inches into Demetria’s chest, which would have required "considerable” force.

. Williams is Caucasian, and Demetria was African American.

. The transcript reflects that, prior to the proffer, Williams’s attorney stated his intent to submit Father Rencher’s entire statement during the proffer. Williams's attorney also indicated that he had Father Rencher's statement designated as D-7 for identification purposes only. However, Williams's attorney did not submit Father Rencher's statement during the subsequent proffer. Father Rencher’s statement is not included among the trial exhibits under any designation or for any purpose, and the exhibit list contains absolutely no document listed as D-7.