ON WRIT OF CERTIORARI

PIERCE, Justice, for the Court:
¶ 1. Following his capital-murder conviction in Jackson County, Terry Hye Jr. received a life sentence without the possibility of parole. The Court of Appeals affirmed Hye’s conviction but vacated and remanded his sentence as unconstitutional, pursuant to the intervening decision of the United States Supreme Court in Miller v. Alabama, — U.S. —, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (holding that mandatory life sentences without possibility of parole for individuals under the age of eighteen years at the time of their crimes violate the Eighth Amendment prohibition against cruel and unusual punishment). Hye was sixteen years old at the time of the crime. Hye v. State, 2013 WL 2303518, at *5, 162 So.3d 818, 824-25 (Miss.Ct.App. May 28, 2013). Aggrieved by the Court of Appeals’ affirmance of his conviction, Hye filed a petition for writ of certiorari in this Court, arguing that the trial court violated his right to a fair trial by denying him an accessory-after-the-fact instruction and an accomplice instruction. Hye also claimed that the trial court failed to properly instruct the jury on the underlying felony of armed robbery, which resulted in a constructive amendment of the indictment. We granted Hye’s petition, and, pursuant to Mississippi Rule of Appellate Procedure 17(h), address only the question of whether the trial court erred by denying Hye an accessory-after-the-fact instruction.
¶ 2. We agree with the Court of Appeals that the trial court properly denied Hye’s request for an accessory-after-fact instruction because there was no evidentiary basis for it. We also find, after much consideration on the matter, that a criminal defendant no longer has the unilateral right under Mississippi law to insist upon an instruction for lesser-related offenses which are not necessarily included in the charged offense(s), i.e., so-called lesser-nonincluded-offense instructions. And we overrule Griffin v. State, 533 So.2d 444 (Miss.1988), and its progeny, to the extent they hold otherwise.
FACTS[1]
On October 23, 2008, Michael and Linda Porter stopped at a Conoco gas station in Moss Point, Mississippi, to ask *752 for directions. Linda testified that Michael got out of the car and began to walk toward the service station. Linda noticed three young black males standing near the car. One of these men had a white towel draped over his head. As Michael returned to the car, two of the men attacked him. Michael was able to get into the car, shut the door, and put the car in gear. Linda testified she saw the man with the white towel on his head walk toward the car, pull out a gun, and shoot Michael through the car window. Linda stated the car sped forward down the road. Linda tried to manage the car, eventually running the car into a ditch. Linda then sought help for Michael, who died from his injuries. Linda was unable to identify these three men.
The shooter was later identified as Darwin Wells, who was fifteen years old at the time of the murder. Wells was convicted of deliberate-design murder and sentenced to life imprisonment. Wells’s conviction was affirmed by this Court in Wells v. State, 73 So.3d 1203, 1204 (¶ 1) (Miss.Ct.App.2011). Three other men were questioned about Michael’s murder: Hye, Tevin Benjamin, and Alonzo Kelly. At the time of the murder, Hye was sixteen years old, Benjamin was fourteen years old, and Kelly was seventeen years old.
Kelly testified for the State at Hye’s trial. Kelly was initially charged with capital murder but ultimately pleaded guilty to accessory after the fact and served eleven months in jail. According to Kelly, earlier that day he, Hye, and Benjamin met Wells at a store, the Little Super. Benjamin and Wells stated they needed money, and Wells said he would “hit a lick.” Kelly stated this meant getting money by any means, legally or illegally. The group left the Little Super and walked to Kelly’s house. On the way, Wells got into a fight with another person on the street. The police responded, and all four men were searched. No weapons or drugs were found on the men. After this, Wells left the group for the afternoon.
The group met again a few hours later at the Little Super. Wells stated again that he needed to “hit a lick.” Hye indicated he needed to find someone to buy him cigarettes, so the group walked to the Conoco. On the way Wells showed his gun to Kelly. Kelly’s testimony indicates the whole group, including Hye, knew Wells was carrying a gun. Once the group neared the Cono-co, Kelly decided to leave and turned around at a stop sign one block away from the Conoco. Kelly was concerned that “every time we go down there or something, we always get locked up for something.” As he was turning away, Kelly said he heard a gunshot and saw Wells, Benjamin, and Hye ran past him. However, at one point, Kelly testified Hye and Benjamin were still standing in the road when Wells approached the Porters’ car.
Hye testified in his own defense and denied any involvement with Michael’s death. Hye stated he thought Wells wanted to sell drags when he said “hit a lick.” Hye said he found someone to buy him cigarettes at the Conoco, but he never set foot on the property. According to Hye, after the Porters drove up, Wells ran from the side of the store but slipped and fell. Only then did Hye notice Wells had a gun. Hye said he and Kelly were walking away when he heard a gunshot.
Benjamin and Wells were called to the stand but refused to testify, each invoking his right against self-incrimination. Zachary Kelly, Alonso [sic] Kelly’s cousin, was called to testify as to a conversa *753 tion he had with Kelly. Zachary also invoked his right against self-incrimination.
Hye, 2013 WL 2303518, at **2-4, 162 So.3d at 821-24.
¶ 3. This Court granted Hye’s Petition for Writ of Certiorari by order entered on January 9, 2014. On June 12, 2014, this Court ordered supplemental briefing regarding “[w]hether Griffin v. State, 533 So.2d 444 (Miss.1988), and its progeny, authorizing ‘lesser non-included’ offense instructions[,] should be overruled.”
¶ 4. Having reviewed the supplemental briefing regarding the question outlined in the June 12, 2014, order from this Court, we find that Mississippi’s practice of instructing the jury on lesser nonincluded crimes is “fundamentally unsound.” We, therefore, overrule Griffin and its progeny. Additional facts, as necessary, will be related in our discussion.
DISCUSSION
¶ 5. As mentioned, we agree with the Court of Appeals that the trial court properly denied Hye’s request for an accessory-after-the-fact instruction. The trial court may refuse a proffered jury instruction if the instruction is without a foundation in the evidence. Murphy v. State, 566 So.2d 1201, 1206 (Miss.1990) (citing U.S. v. Robinson, 700 F.2d 205, 211 (5th Cir.1983)). As illustrated by the record, Hye’s theory of the case was that he did nothing wrong the evening of October 23, 2008, other than illegally purchase cigarettes at the Conoco gas station, and not report the shooting to the police. No evidence was presented to Hye’s jury that would have allowed it to consider whether Hye was guilty as an accessory after the fact, as prescribed by Mississippi Code Section 97-1-5(1) (Rev.2014).[2]
¶ 6. Hye’s requested instruction in this instance is known as a lesser-nonincluded-offense instruction — typically referred to as such because it instructs the jury on an offense whose essential elements are not included (or a subset) of the offense(s) charged in the indictment. This type instruction lies in contrast with what is known as a lesser-included-offense instruction — referred to as such because all of its essential elements are also essential elements of the greater offense charged.
¶ 7. Like most jurisdictions, Mississippi has long recognized that an offense alleged in the indictment (or accusatory pleading) may necessarily include one or more lesser offenses. Under Mississippi Code Section 99-19-5, the jury may convict the defendant of an “inferior offense, or other offense, the commission of which is necessar: ily included in the offense with which he is charged in the indictment ...,”[3] This *754 Court repeatedly has interpreted Section 99-19-5 (and its predecessors) to “apply only to an inferior offense ‘necessarily included within the more serious offense.’ ” See Hailey v. State, 537 So.2d 411, 414 (Miss.1988) citing Sanders v. State, 479 So.2d 1097, 1105 (Miss.1985); Gillum v. State, 468 So.2d 856, 861 (Miss.1985); Cannaday v. State, 455 So.2d 713, 725 (Miss.1984); Biles v. State, 338 So.2d 1004 (Miss.1976); Gray v. State, 220 Miss. 220, 70 So.2d 524 (1954); Boggan v. State, 176 Miss. 655, 170 So. 282 (1936); Brown v. State, 103 Miss. 664, 60 So. 727 (1913); Bedell v. State, 50 Miss. 492 (1874).
¶ 8. A lesser offense is necessarily included in the greater offense if the elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. See Porter v. State, 616 So.2d 899, 909-10 (Miss.1993) (Hawkins, J., specially concurring) (“A lesser included offense by definition is one in which all its essential ingredients are contained in the offense for which the accused is indicted, but not all of the essential ingredients of the indicted offense. An accused could not be guilty of the offense for which he is indicted without at the same time being guilty of the lesser-included offense.”). As we explained in Hailey, 537 So.2d at 416, “if under the facts alleged in the indictment a lesser offense is necessarily included, then a conviction of the lesser offense may be proper[; but] [t]he indictment must sufficiently allege the lesser crime so that the defendant is notified of the lesser charge .... ” When the indictment alleges a particular offense, it thereby demonstrates the State’s intent to prove all the elements of any lesser-included offense. And the stated charge notifies the defendant, for due process purposes, that he or she must also be prepared to defend against any lesser-included offense, even if the lesser offense is not expressly set forth in the indictment. See Wallace v. State, 10 So.3d 913, 917 (Miss.2009) (“[B]y its very definition, a defendant is always on notice of a lesser-included offense.”).
¶ 9. In 1988, this Court greatly expanded the law in this area in the case Griffin v. State, with its holding that a criminal defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a continuing factual scenario giving rise to the charge laid in the indictment. Griffin, 533 So.2d at 447-48. Griffin explained:
This case presents a problem we encounter all too often. The prosecution charges the accused with a serious felony, only to have the defense offer a version of the facts rendering the accused far less culpable and, most important, subject to a far lesser punishment. If the evidence be such that a reasonable jury might have found the facts as the defense suggests them to have been, the accused of right is entitled to have the jury consider that option and be instructed to that effect.
Id. at 445 (emphasis added). In applying this rationale to the case before it, Griffin reasoned:
Whether simple assault is formally a lesser included offense to rape is not the point. We have before us a continuing factual scenario bracketed by a relatively brief period of time .... The facts suggest that Griffin may have been guilty of at least two possible courses of criminal conduct: rape and simple assault, the latter carrying a maximum penalty far less than the former. As the *755 jury may on these facts reasonably have found Griffin guilty of simple assault but not guilty of rape — -without any inconsistency in evidentiary or ultimate findings, it follows that Griffin was of right entitled to have the jury instructed on the lesser offense of simple assault.
Id. at 447-48.
¶ 10. From Griffin, Mississippi began its “journey into non-included offense instructions.” McDonald v. State, 784 So.2d 261, 269 (Miss.Ct.App.2001) (J. Southwick, specially concurring).
¶ 11. At this point, we must reiterate that fundamental jurisprudential policy requires that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current court. This doctrine is known as stare decisis. The principle is based on the assumption that consistency and definiteness in the law are the major objectives of the legal system. Laurel Daily Leader, Inc. v. James, 224 Miss.654, 681, 80 So.2d 770, 780-81 (1955) (Gillespie, J., special opinion). Stare decisis, however, is not immutable “but is flexible enough to allow the Court to admit ... change under certain limited circumstances ... where the previous rule of law would perpetuate error and wrong would result if the decisions were followed.” Id. at 781. This Court has recognized that the doctrine is subordinate to legal reason and justice, and courts “will depart therefrom when such departure is necessary to avoid the perpetuation of pernicious error.” Stone v. Reichman-Crosby Co., 43 So.2d 184, 190 (Miss.1949).
¶ 12. We find this to be the case with the Griffin rule. Indeed, our Court of Appeals, which hears many criminal appeals each year, has recognized and communicated on numerous occasions the problematic nature this practice creates for our criminal jurisprudence. Also, the Uniform Criminal Rules Study Committee, which comprises some of the finest legal minds in this state in the area óf criminal law, has proposed the Griffin rule be abandoned. The vast majority of states do not allow the practice. And the United States Supreme Court prohibits the practice in the federal courts by virtue of Rule 31(c) of the Federal Rules of Criminal Procedure, which limits a defendant to instructions on lesser offenses “necessarily included” in the offense charged.
¶ 13. As Judge Maxwell rightly pointed out in Gebben v. State, 108 So.3d 956, 970 (Miss.Ct.App.2012), the concept of allowing lesser-nonincluded-offense instructions is grounded in neither the United States Constitution, the Mississippi Constitution, our statutes, or Mississippi precedent; rather, it derives exclusively from this Court’s opinion in Griffin. See also Williams v. State, 53 So.3d 761, 792 (Miss. Ct.App.2009) (Roberts, J., dissenting) (noting same and contending that this Court’s endorsed practice for allowing such instructions runs afoul of Article 3, Section 27 of the Mississippi Constitution of 1890); Brooks v. State, 18 So.3d 859, 876 (Miss.Ct.App.2008) (Carlton, J., dissenting) (contending that our state constitution and statutory law allow only for lesser-included-offense instructions).
¶ 14. In McDonald, Judge Southwick called attention to the flawed reasoning in Griffin.
In the original case that unleashed us on her journey into non-included offense instructions, the Court said “[wjhether simple assault is formally a lesser included offense to rape is not the point.” Griffin [], 533 So.2d at [] 447. With respect for the Court and the author of that opinion, that should be and had before then been exactly the point. If the elements on the lesser offense are *756 all in the greater offense, then what is in the lesser offense instruction will necessarily have been examined fully in the trial.
The problems of this case, when the lesser non-included charge was based on factual issues that were not meaningfully developed, are one more set of reasons that this whole area of law has proved perhaps unexpectedly troublesome. The evidence here of an effort to arrest was incidental at best, though it did exist. A jury should not be asked to determine the guilt of a person on an offense for which he was not even tried.
McDonald, 784 So.2d at 269-70.
¶ 15. We agree.
¶ 16. At the outset, we point out that Griffin instituted the rule without much discussion and cited no authority for its support. Though Griffin did not expressly say, we think it fair to surmise that the Court was proceeding on what it believed was a practical and logical extension of Mississippi’s existing law for lesser-nonin-cluded-offense instructions. As will be explained, though, the rule is neither a practical nor a logical extension of existing Mississippi law, but rather is subversion of it.[4] Also, we think Griffin was likely persuaded, if not influenced, by a federal Court of Appeals decision, United States v. Whitaker, 447 F.2d 314 (D.C.Cir.1971), and a California Supreme Court decision, People v. Geiger, 35 Cal.3d 510, 199 Cal.Rptr. 45, 674 P.2d 1303 (1984). Geiger relied heavily on Whitaker’s rationale when instituting California’s lesser-nonincluded-of-fense rule — which, before being overturned by the California Supreme Court, was a carbon copy of the Griffin rule. See, e.g., Williams, 53 So.3d at 792 (Roberts, J., dissenting) (pointing out that “[a]f-ter fourteen years’ experience [with the lesser non-included-offense practice], California reversed course [in People v. Birks, 19 Cal.4th 108, 77 Cal.Rptr.2d 848, 960 P.2d 1073, 1090 (1998) ] and joined the majority of jurisdictions that do not permit such jury instructions”).
¶ 17. In Whitaker, the D.C. Circuit held that a defendant’s right, under Federal Rule 31(c), to request instructions on lesser necessarily included offenses shown by the evidence could not be confined by a strict comparison of the elements of the greater and lesser offenses. The Whitaker court reasoned, “[a] more natural, realistic, and sound interpretation ... is that the defendant is entitled to invoke Rule 31(c) when a lesser offense is established by the evidence adduced at trial in proof of the greater offense, with the caveat that there must also be an ‘inherent’ relationship between the greater and lesser offenses, i.e., they must relate to the protection of the same interests, and must be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense.” Whitaker, 447 F.2d at 319. As the Fifth Circuit Court of Appeals noted in U.S. v. Browner, 937 F.2d 165, 168 (5th Cir.1991), the “inherent relationship” test adopted by Whitaker is “one of three [recognized] tests to determine when, assuming a proper evidentiary showing, an offense not otherwise specifically charged may be deemed a lesser included offense of another, greater offense charged.” The “inherent rela *757 tionship” test is the most expansive of the three tests. Browner, 937 F.2d at 168. Significantly, though, the test is a two-way street; meaning, the standard applies both to the defendant and the prosecution, mutually. In short, Whitaker’s “inherent relationship” test is a far-reaching, lesser-included-offense test. And it has since been discredited by the United States Supreme Court for purposes of Federal Rule 31(c). See Schmuck v. United States, 489 U.S. 705, 715-21, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).
¶ 18. In Geiger, California accepted the essence of Whitaker’s rationale for the concept of related offenses. Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1081. But Geiger declined to broaden California’s definition of necessarily included offenses in the manner prescribed by Whitaker for the prosecution. Id. at 1081. What resulted in California, according to Birks, was the establishment of a unilateral right for criminal defendants “to demand instructions on charges neither stated nor necessarily included in the accusatory pleading .Id. Such a right both “usurp[s] the prosecutor’s charging discretion and ... undermine[s] the mutuality of rights and obligations between the parties.” Id.
¶ 19. The same has resulted in Mississippi under the Griffin rule. By allowing a criminal defendant “to seek and obtain conviction for a lesser [nonincluded] offense whose elements the state has neither pled nor sought to prove” gives the defendant a “superior trial right.” See, e.g., Sheffield, 64 So.3d at 533, and Williams, 53 So.3d at 793 (Roberts, J., dissenting) (both quoting Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1074).
¶ 20. As recognized by the Uniform Criminal Rules Study Committee, prior to Griffin, there existed symmetry in Mississippi’s criminal jurisprudence. Again, under the lesser-included-offense doctrine, all the elements of the charged offense are treated as pleaded in the indictment and undertaken to be proven by the prosecution - at trial. Criminal defendants are deemed on notice of all the elements contained in the greater offense, and thus are likewise on notice of any other offense, the commission of which is necessarily included in the offense with which the defendant is charged in the indictment. See Miss.Code Ann. § 99-19-5(1) (Rev.2007). Both the prosecution and the defendant may seek an instruction on a lesser-included offense. Under the Griffin rule, however, only the criminal defendant may request a lesser-nonincluded-offense instruction, as constitutional notice considerations forbid the prosecution from receiving an instruction on a lesser offense whose elements are not included in the indictment. We find the inherent imbalance embodied by the Griffin rule is significant and unsustainable.
¶ 21. We first point out that, soon after Griffin was decided, “all arguable federal support for its conclusions has been withdrawn.” See Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1082 (finding same with Geiger). As Birks observed, the rationale of the Geiger decision has since been unequivocally repudiated by the United States Supreme Court in Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), and Hopkins v. Reeves, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998).
¶ 22. In Schmuck, the Court held that the right of a federal noncapital defendant to obtain instructions on a lesser-included offense under Federal Rule 31(c) is limited by a strict-elements test which compares only the statutory definitions of the two crimes. Schmuck, 489 U.S. at 715-21, 109 S.Ct. 1443. “Where the lesser offense requires an element not required for the greater offense, no instruction is to be *758 given under [Federal] Rule 31(c).” Id. at 716, 109 S.Ct. 1443. Also, as Birks noted, Schmuck expressly disapproved the contrary. inherent relationship test of Whitaker, for multiple legal and policy reasons. Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1082 (citing Schmuck, 489 U.S. at 715-16, 109 S.Ct. 1443).
¶23. In Hopkins, the Supreme Court expressed that the practice of allowing lesser-nonincluded-offense instructions is “not only unprecedented, but also unworkable[,]” and is likely to “detract from, rather than enhance[], the rationality of the process.” Hopkins, 524 U.S. at 97-99, 118 S.Ct. 1895 (citations omitted).
¶ 24. Both Schmuck and Hopkins “identified serious legal and practical difficulties with any requirement that instructions on nonincluded offenses be given in criminal cases.” Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1082. Birks observed that Schmuck expressed a fundamental concern for mutual fairness between the defense and prosecution with the law governing instructions on lesser offenses. Birks explained:
Schmuck’s reasoning also impresses us for broader and more fundamental reasons. In particular, we are persuaded that the concern for mutual fairness between defense and prosecution, as set forth in Schmuck, is an important one which has independent foundation in California’s law governing instructions on lesser offenses. The Geiger rule contravenes the principle of mutual fairness by giving the defendant substantially greater rights either to require, or to prevent, the consideration of lesser non-included offenses than are accorded to the People, the party specifically responsible for determining the charges. Geiger’s soundness is therefore suspect.
Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1084.
¶ 25. We likewise are persuaded by Schmuck’s reasoning and Birk’s concerns. In his dissent in Barber v. State, 743 So.2d 1054 (Miss.Ct.App.1999), Judge Southwick touched on similar concerns when recognizing that the Griffin rule is prone to conflict with another fundamental principle — the State’s charging decision. Judge Southwick expressed the following:
A related criminal law doctrine is that even if the same facts would support the conviction of two different crimes with much different punishments, the grand jury can indict for the greater and there is no obligation that a lesser offense also be charged to the jury.
Even where there are two statutes covering the same crime, and there is a difference in the penalty between the two statutes, the [S]tate is under no obligation to prosecute under the statute with the lesser penalty. It may choose to prosecute under either, and so long as the choice is clear and unequivocal the defendant has no right to complain.
Cumbest v. State, 456 So.2d 209, 222-23 (Miss.1984), cited in Gibson v. State, 731 So.2d 1087 (¶ 21) (Miss.1998). The only manner in which these two doctrines can work together without capriciousness, so long as the doctrine of “lesser [nonin-cluded] offense” is to be perpetuated, is if there are restrictions maintained as to when the lesser offense is to be charged.
¶26. Today, we find that the Griffin rule cannot be squared with the principle recognized and maintained by Cumbest. We also find there are no workable restrictions (or clear standards) that would prevent the Griffin rule from interfering with the role accorded to the State alone, the responsibility to determine the charges. See, e.g., Birks, 77 Cal.Rptr.2d 848, 960 P.2d at 1086 (same). The Griffin rule, we are now convinced, has a very real propen *759 sity to lead to “unsound compromise verdicts.” See, e.g., Geiger, 199 Cal.Rptr. 45, 674 P.2d at 1317 (Richardson, J., dissenting). Such outcomes place the truth-seeking process that is a criminal trial in serious doubt.[5] And we cannot allow that. To paraphrase Justice Jackson, we refuse to remain consciously wrong today simply because we were unconsciously wrong yesterday. Massachusetts v. United States, 333 U.S. 611, 639-40, 68 S.Ct. 747, 92 L.Ed. 968 (1948) (Jackson, J., dissenting).
¶ 27. In our criminal jurisprudence, the party responsible for determining the charges to present to the grand jury is the State. When the grand jury returns an indictment on the presented charge, the State assumes the obligation to prove the charge and any necessarily included offense beyond a reasonable doubt. At the very least, any conviction of a charged or necessarily included offense is based on evidence adduced by the State in sustaining its hefty burden. The defense of course has no duty whatever to prove or disprove any crime by any standard. And the State undertakes no duty to prove uncharged, nonincluded offenses. Cumbest, 456 So.2d at 222-23. Thus, and particularly when the State does not consent, the giving of lesser-nonincluded-offense instructions invites the jury to convict the defendant of a crime that no party may have attempted to establish beyond a reasonable doubt.
¶ 28. Case in point is illustrated by the trial record before us. As mentioned, Hye’s theory of the case at trial was that he did nothing wrong the evening of October 23, 2008, except: (1) illegally purchase cigarettes at the Conoco gas station, by soliciting an older gentleman who lived near the Conoco to make the purchase for him; and (2) not report the shooting to the police, because he was scared of Darwin Wells (not a criminal offense in this jurisdiction, because Mississippi does not recognize misprision of felonies). According to Hye’s testimony, the only reason he went to the Conoco gas station with Benjamin, Wells, and Alonzo Kelly was to get cigarettes. Hye testified that, after receiving his cigarettes and while standing across the street from the Conoco with Kelly and Benjamin, he heard Wells, who was on the Conoco property running towards the Porters’ vehicle, yell “I’m fixing to hit a lick.” Hye told the jury, “When [Porter] came out, [Wells] ran up to the car and slipped and got up and said: Give it up.” When Hye saw Wells’s gun for the first time, Hye and Kelly began walking away and had their backs turned away from the Conoco. When Hye heard the shot, Hye and Kelly ran. Hye said Benjamin ran behind Kelly, and Wells ran behind Benjamin. Kelly told Wells, “don’t run behind us.” Hye, Kelly, and Benjamin ran to Kelly’s house. From there, Hye and Benjamin went to the “Little Super” store and “caught a ride” to Hye’s house. The following night, a Friday, Hye, Kelly, and Benjamin went to the fair. There, they ran into Wells. None discussed what had transpired the night before. Hye told the jury that he did not know Michael had died until Sunday night, when the police contacted him. Hye also told the jury that he did not know what Wells meant by “hit a lick.” Hye further told the jury that the note he wrote to Benjamin while in jail awaiting trial (which jail officials had confiscated, turned over to the State, and which was submitted by the State to Hye’s jury at trial) was intended only to remind *760 Benjamin not to lie to officials, because Hye and Benjamin did nothing wrong.
¶ 29. The dissent posits that “Hye contended at trial that he had lied to police and covered for other members of the group, which according to his petition for writ of certiorari, ‘could have led the jury to believe that [Hye] was an accessory after the fact.’ ” This is incorrect. Nowhere in the record did Hye ever contend that he lied to the police to cover for other members of the group. Rather, Hye initially denied that he knew anything about the shooting at the Conoco. After admitting to authorities that he was present near the Conoco at the time of the shooting, Hye consistently maintained throughout that the only person who was involved in the shooting was Wells, and Hye consistently stated that the group separated from Wells after the shooting. The only discrepancy in Hye’s story was with his statement during cross-examination at trial that Benjamin was ' on the Conoco’s premises at one point, standing next to Wells. Hye maintained, though, that he did not see Benjamin do anything wrong.
¶ 30. The dissent also posits that Hye “cited Kelly’s testimony to show that Hye had colluded with Kelly, Benjamin, and Wells to concoct an exculpatory version of events.” Hye’s appellate counsel cites the following testimony from Kelly at trial for this contention:
Q. All right. Do you remember when you talked to the police?
A. Yes, sir.
Q. It was that Monday?
A. Yes, sir.
Q. Okay. Over the weekend, I imagine you had been talking to all three people at the scene?
A. Yes, sir.
Q. Y’all had been discussing what happened down at the scene?
A. Yes, sir.
Q. Did you tell the police what you know — or knew back then?
A. Yes, sir.
¶ 31. From this, the dissent would have us find that, because Hye testified that he and Benjamin had caught a ride from Moss Point to Pascagoula, where they stayed at Hye’s aunt’s house, “there was evidence to support that [Hye] provided assistance to [Benjamin] by providing shelter to him at a relative’s following the shooting.” This is conjecture, not evidence.
¶32. As did Hye, Kelly maintained throughout his testimony that he had his back turned from the Conoco at the time of the shooting. Kelly said he did not see either Hye or Benjamin ever walk onto Conoco’s premises. The trial record is utterly barren as to what occurred between these individuals during the weekend following the shooting and before their arrests on Monday. And there is no sufficient evidence whatsoever to support the theory that Hye concealed, received, aided, or assisted a felon, knowing that such person had committed a felon with intent to enable the felon to escape, avoid arrest, trial conviction or punishment after the commission of the felony.
¶ 33. Kelly, who the dissent points out testified “it wasn’t no plan[;][n]obody was planning to go rob nobody[,]” also testified as follows in response to the State’s question: “And is that when you said: Who’s got the gun?”:
I like, I said: How can we do, hit a lick, you know what I’m saying? Like, what you going to do? You going to sell some crack or something, because, you know what I’m saying? So, so, [Wells] was like no, I got — He showed me the gun. So, everybody was like, you mean he got gun for real? So, you know, everybody *761 went to walking. So, I was like, no, no, I ain’t going to it. You get locked up every time you go to the store. So, then I stopped.
Later on, in cross-examination, the following exchange occurred between Kelly and Hye’s defense counsel:
Q. Earlier, when Mr. Lawrence was questioning you, did you not testify that you heard someone say they were going to commit a robbery?
A. Yes, sir, going to hit a lick.
Q. All right. And what does “hit a lick” mean?
A. Referring to getting money. Any part of getting money. Whatever you feel like it will take for you to get money, that what it mean.
Q. Okay. So, for example, if I go to work, am I hitting a lick?
A. If you getting money.
Q. If I get paid at the end of the week, did I hit a lick?
A. Yes, sir.
Q. All right. And if I go down there and somebody pulls up in the Conoco and I have some crack cocaine in my pocket and I go up and do what /all call service him and I sell some crack to that person, did I just hit a lick if they pay me back?
A. Yes, sir. If you’re getting paid for it, you hit a lick.
Q. Okay. If I’m getting money for it, it’s hitting a lick?
A. You can go out there and cut 10 yards, you hitting a lick. •
Q. And that means hit a lick? Right?
A. Yes, sir.
Q. Okay. So, that’s what you heard that day. Am I right?
A. Yes, sir.
Q. Did you hear anything about a robbery?
A. No, I didn’t hear about no robbery, but I knew what was going on. I ain’t, I ain’t, I ain’t dumb or nothing.
Q. But you didn’t hear anything about a robbery.
A. I didn’t hear nothing about no robbery.
Q. Do you remember in the tape we just listened to you said something about a robbery?
A. Yeah, he asked me, he asked me what hitting a lick mean. I say it can mean, it can mean robbery or anything. If you go back to the tape, you will see that.
Q. So, that day, nobody mentioned committing a robbery. Are we sure of that?
A. Yeah, nobody — nobody said it was a robbery. He said hit a lick.
¶ 34. As mentioned, Kelly maintained throughout his testimony that he had his back turned from the Conoco at the time of the shooting, and that he did not see either Hye or Benjamin, who were standing together in the road next to the Cono-co, ever walk onto the Conoco premises. Kelly’s testimony alone, of course, is insufficient to support the State’s theory that a killing occurred while Wells, Hye, and Benjamin were engaged in the act of robbery. But, when coupled with Linda’s testimony that she saw three individuals standing together in the rain at the Cono-co, and that two of those individuals physically attacked Mike while he was outside the vehicle, and that the third individual then shot Mike after Mike reentered the vehicle, the evidence becomes more than sufficient for a jury determination as to whether Hye was a principal by statute to the crime of capital murder with the underlying felony of robbery. Linda testified as follows:
*762 After [Michael] gets out of the car, he tosses his little daytimer in, and I just kind of threw it in the back. And I look up and I see these three black males standing there. And I’m thinking, well, that’s strange. You know, it’s raining and they’re just standing there. And then just within seconds, they start walking toward the car. And I’m thinking: Oh, this doesn’t feel very safe. But then all of a sudden they kind of split off. And two of them are together, the two without a white towel. Then the one with the white towel starts going toward the driver’s side of the car and the other two gentlemen split off toward the passenger side.
The eerie, unnerving thing was, the one with the white towel just kept staring at me, right in the face. It was just like our eyes had locked and I just was watching him. And he was approaching the driver’s side. And that’s when I’m thinking maybe I’ll lock the car. But, he, instead of headed [sic] straight to the car, then he starts veering out a little, kind of fanning out, maybe moving toward the gas pumps. And I’m just watching him. And then all of a sudden, I just hear this noise, I mean, bumping the car. And at that pont, I look around and Mike is at the door, getting the door open and trying to get in the car, and there’s two — the other two boys are all on top of him, and one’s got him around the neck and the other’s got him on his arm, and he’s doing this (demonstrating), trying to get rid of them. And he’s trying to get in the car, and it’s a real struggle. And he manages to get into the car, and these other two guys are trying to get in the car with him, and he’s trying get rid of them. And he is a pretty big guy and these guys weren’t nearly his size. And he’s able to get most of the body parts out of the door, but he’s slamming the door on them, just like this, trying to get rid of them.
Q. Can you tell the members of the jury who — the two that were — or the individual that was stopping the door from shutting, the one with the towel on his head or the other two?
A. The guy with the towel on his head was not involved in this struggle at all.
Q. Okay.
A. It was the other two gentlemen. And as they were attempting to hold Mike back, to keep him from getting in the car or to do whatever, he is fighting them off. He gets in the car and manages to get the door closed, and he’s holding it with this hand.
Q. Which hand?
A. His right hand. He’s holding the door closed. And basically, because they were pulling him like this. He closed the door with his right hand, and reaches with his left hand to start the ignition and get it in gear. And in the meantime, he is saying, “We’ve got to get out of here.” He said, “Baby, we got to get out of here right now. We got to get out of here now.” And I looked up, and all of a sudden, I see the one with the white towel approaching the car very slowly and very definite. And I look up as he’s approaching the car and then all of a sudden, I see a gun — like this. And I’m thinking, he’s going to shoot me. I mean right between the eyes. I mean it was right in my face. And I’m not screamer and I’m not a yeller, I’m not any of those things. So, I’m just watching him. And he’s watching me. And then all of a sudden, he brings his left hand over, grabs the gun, and he aims it down toward Mike and, very, carefully, he picked his spot to shoot. And he got a shot off before Mike could get the car into gear. And when he shot, he shot through the driv *763 er’s window. It hit Mike in here as he’s doing this. (Demonstrating). Glass goes every where, all in my face, my shoulders, my arms and everything. And about that time, Mike obviously has gotten it in gear, so we immediately shoot out of there. I mean, we’re just gone. That car is just going as fast as his foot on the accelerator will allow it.
¶35. With the aforementioned record testimony in mind, the problem with both Hye’s and the dissent’s contention that the jury should have also been allowed to take into consideration Hye’s guilt as an accessory after the fact to felony murder, is that there is nothing but inferences upon inferences to support that proposed theory of the case. The State’s description of the weekend following the shooting as a “weekend alibi fest,” constitutes merely such an inference. The inference counts as nothing in the calculation of whether the State met its burden in introducing substantial evidence in support of its case against Hye. Henton v. State, 752 So.2d 406, 409 (Miss.1999) (closing arguments are not evidence). Nor would (or should) the inference count in the calculation of whether substantial evidence exists in support of an alternative theory of the case. Accordingly, and for the reasons explained above, Hye’s proposed accessory-after-the-fact instruction lacked an evidentiary basis. Thus, the trial court properly denied it.
¶ 36. The trial court did, however, grant the following instructions, which we find fully covered Hye’s defense at trial that he was not a participant to the alleged crime: Jury instruction S-8, provided:
The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.
If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.
Before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associated himself in some way with the crime and participated in it with the intent to bring about the crime.
Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.
In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.
¶ 37. Jury instruction D-21, provided:
One who aids and abets another in the commission of a crime is guilty as a principal. However, in order to aid and abet the commission of a felony, Terry Hye must have done something to incite, encourage, or assist the actual perpetrator in the commission of the crime or participate in the design of the felony.
*764 ¶38. Finally, by according the defendant the power to insist, over the State’s objection, that an uncharged, nonincluded offense be placed before the jury, the Griffin rule (which is court-created) usurps the State’s exclusive charging discretion, and may therefore violate Mississippi’s separation-of-powers clause, as recognized by our Court of Appeals. We need not reach that question, however, because we find Griffin was wrongly decided for reasons otherwise stated above.
CONCLUSION
¶ 39. The judgment of the Court of Appeals upholding Hye’s conviction and vacating Hye’s sentence, remanding to the trial court for resentencing, is affirmed. Griffin and progeny authorizing lesser-nonincluded-offense instructions are hereby overruled. Section 99-19-5(1) and this Court’s precedential interpretation of it consistent with Hailey, et al, governs what lesser offenses may be charged to the jury.
¶ 40. CONVICTION OF CAPITAL MURDER, AFFIRMED. SENTENCE OF LIFE WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS VACATED, AND THIS CASE IS REMANDED TO THE JACKSON COUNTY CIRCUIT COURT FOR RESENTENC-ING.
WALLER, C.J., RANDOLPH, P.J., LAMAR AND COLEMAN, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS, J. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J. CHANDLER, J., JOINS THIS OPINION IN PART.

. Facts are taken verbatim from the opinion of the Court of Appeals.

. Mississippi Code Section 97-1-5(1) states in part:
Every person who shall be convicted of having concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or to avoid arrest, trial, conviction or punishment after the commission of the felony, on conviction thereof shall be imprisoned in the custody of the Mississippi Department of Corrections ....

. Section 99-19-5 is a derivative of the common law practice that permitted a jury to find a defendant guilty of any lesser offense necessarily included in the offense charged. See, e.g., Mease v. State, 539 So.2d 1324, 1328 (Miss.1989) ("At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged."). In 1848, the Mississippi Legislature codified this common law practice in Hutchinson’s Code 1848, ch. 64, art. 12, title 8, § 22, which reads: "Upon an indictment for any offence consisting of different degrees, the jury may find the accused not guilty of the offence in the degree charged in the indictment, and may find such accused person guilty of any degree of such offence, *754 inferior to that charged in the indictment
[[Image here]]

. Both Hye and the Amicus Curiae submit that Section 99-19-5(1) authorizes lesser-non-included-offense instructions via the "inferior offense” clause contained therein. We disagree. As mentioned above, we repeatedly have interpreted this section to apply only to an inferior offense necessarily included within the more serious offense. See Hailey, 537 So.2d 411, et al.

. This goes beyond the pernicious concern this Court referred to in Stone, 43 So.2d 184, in speaking to the doctrine of stare decisis.