# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01090-COA

**ROBERT PHINIZEE A/K/A ROBERT DELAWRANCE PHINIZEE**  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2023 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | ROBERT R. MORRIS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/01/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Robert Phinizee was convicted of conspiring and attempting to murder his estranged wife, Jasmine Hoskins. On appeal, he argues that (1) the evidence is insufficient to support his conspiracy conviction, (2) the trial court erred by excluding evidence that Hoskins previously assaulted him, and (3) the trial court erred by refusing to give a jury instruction on the lesser offense of aggravated assault. For the reasons discussed below, we affirm.

## STATEMENT OF FACTS

¶2. Phinizee and Hoskins were married for ten years and had three children together before separating in February 2019. After they separated, Phinizee began dating Chasity

Shelley. On the evening of February 9, 2020, Phinizee drove to Shelley's townhouse in Memphis and told her that the "bitch" (Hoskins) "had to go." Phinizee and Shelley then discussed places where one could dispose of a body. Later that night, Phinizee and Shelley drove from Shelley's townhouse in Memphis to Olive Branch in "the vicinity" of Hoskins's home. Phinizee left the car carrying a gun, and Shelley then drove back to Memphis.

¶3. That same evening, Hoskins and her four children went to bed around 11 p.m. in her home in Olive Branch. Sometime between 1 and 4 a.m., Phinizee entered the home, and an altercation occurred that ended with Phinizee shooting Hoskins once in the stomach. Phinizee then left Hoskins's home, taking the four children with him, and drove back to Shelley's townhouse in Hoskins's car. Phinizee told Shelley that he had "gotten into it" with Hoskins and shot her. Shelley urged him to return to Hoskins's home and turn himself in. Phinizee drove back to Hoskins's home, where he was arrested. Phinizee and Shelley were later indicted for conspiracy to commit murder and attempted murder. Phinizee's first trial ended in a mistrial. He was retried in August 2023.

¶4. Shelley testified for the State.[1] She first met Phinizee in 1997 while they were in high school, and they dated off and on for four years before ending their relationship. They reconnected in June 2019. Phinizee told her that he was divorced, and they dated again for "three or four months."

¶5. On the evening of February 9, 2020, Phinizee unexpectedly arrived at Shelley's townhouse. Phinizee felt the need to tell her what had "been going on" and why he had

---

[1] Shelley testified that her charges were still pending and that she had not been promised anything for her testimony.

"been acting differently." He then told Shelley that the "bitch" (Hoskins) "had to go" because she had "stolen his credit or bought a car in his name." Shelley suggested that Hoskins go to the police instead of killing Hoskins, but Phinizee "was adamant about" killing Hoskins and did not "want to hear 'no.'" Shelley told Phinizee that she did not want to help him because she was "her daughter's only parent." However, she ultimately "cooperated with him" because she was afraid of what he might do if she refused. Shelley testified that Phinizee had a 9mm firearm tucked near his abdomen during their conversation. Shelley also learned that Phinizee did not have his personal phone with him but had a "very old Nokia-looking phone" because he "didn't want to be tracked."

¶6. Phinizee asked Shelley if she knew of any places where he could dispose of a body. Shelley suggested Harbor Town, a neighborhood on Mud Island on the Mississippi River north of downtown Memphis. Phinizee wanted to see the area, so they drove together to check it out. They returned to Shelley's townhouse, and Phinizee asked Shelley if she would take him to his "partner's" or "friend's" house. Phinizee and Shelley got in his car, drove south on Interstate 55, and took the Stateline Road exit in Mississippi. As Phinizee drove, he began discussing ways "to dispose of a body or make a body unrecognizable." Phinizee told Shelley that the way to do it is "to dismantle their hands and their head and their feet so they can't be identified" and then "burn the body." Shelley testified that in addition to his gun, Phinizee had brought zip ties, a gas can, and a backpack with a hatchet in it. At this point, Shelley concluded that Phinizee was not driving to "a partner's house" as he had said but was probably driving toward "the vicinity of [Hoskins's] house." Around 1 a.m.,

3

Phinizee stopped at a stop sign, exited the car carrying his gun, backpack, hatchet, and zip ties, and walked away. Shelley testified that she believed that Phinizee "was going to commit a crime," but she did not call police "because [she] didn't know . . . where to tell them to go." Shelley then drove back to her townhouse in Memphis and parked Phinizee's car on the street outside the gate of her townhouse.

¶7.     Phinizee returned to Shelley's townhouse around 5 a.m.  Shelley testified that Phinizee was "panicky."  He told her that he had gone to Hoskins's house, that he and Hoskins "got into it," and that he shot Hoskins.  Phinizee told Shelley he had taken Hoskins's car after the shooting.  He asked Shelley to dispose of his gun, and Shelley later threw the gun in the Mississippi River.  Phinizee also gave Shelley some of Hoskins's personal items including a laptop, wallet, gym clothes, and children's items.  Shelley also disposed of those items, although Phinizee did not specifically ask her to do so.

¶8.     Shelley testified that Phinizee repeatedly paced back and forth between her front door and Hoskins's car, which she found suspicious.  As Phinizee was preparing to leave, Shelley realized that the four children were in the car.  Shelley urged Phinizee to return to Hoskins's house because he had shot Hoskins and "cross[ed] state lines with her children."  Phinizee then drove back to Hoskins's house in Hoskins's car.  Shelley never saw him again. Phinizee's car remained parked outside the gate of Shelley's townhouse.

¶9.     The Olive Branch Police Department interviewed Shelley on March 24, 2020.  Shelley told police that Phinizee said he had thrown a gun in the river.  At trial, Shelley admitted that she did not tell the police that she had thrown a gun in the river and disposed of some of

4

Hoskins's personal items. Shelley testified she initially withheld this information from the police because she "didn't really want any involvement" because she was her daughter's only parent. At the time of Phinizee's trial, Shelley's charges were still pending, and she testified she had not been promised anything for her testimony. When asked if she expected to serve time in prison for conspiracy, Shelley stated that she did not believe there was any "conspiracy" but that she did not expect anything for her cooperation.

¶10. Hoskins's neighbor Miranda White testified that around 4 a.m. on February 10, Hoskins began "banging" on her front door and frantically ringing the doorbell. When White opened the door, Hoskins stated that her husband had shot her. White, a nurse practitioner, began applying pressure to Hoskins's wound and called 911. Around that time, White saw Hoskins's car leaving Hoskins's driveway, but she could not tell who was in the car.

¶11. Austin Rea, the emergency medical technician who responded to the 911 call, testified that Hoskins had serious and life-threatening injuries. In his report, Rea noted that Hoskins had "bruising around [her] neck consistent with strangulation."

¶12. The lead investigator, Major Sherrie Driver of the Olive Branch Police Department, arrived at Hoskins's house around 5 a.m. and realized that she knew Hoskins and Phinizee from a prior incident. In late 2019, Phinizee had reported Hoskins missing, but Driver had determined that Hoskins was not missing and closed the case.

¶13. Driver canvassed the crime scene and created a diagram of Hoskins's home. She found a bloody comforter and a pool of blood beside Hoskins's bed. A trail of blood led from Hoskins's bedroom to the kitchen, through the living room, and out the front door.

Driver did not find any shell casings in the home or the gun used in the shooting.

¶14. Driver retrieved video footage from a security camera at another home on the street. The security camera captured every vehicle coming into or out of the cul-de-sac where Hoskins lived. Driver reviewed the video and determined that Phinizee's car entered the cul-de-sac at 1:08 a.m. The car stopped, someone got out, and the car then drove away at 1:12 a.m. The video also showed Hoskins's car leaving the cul-de-sac at 4:20 a.m.

¶15. Driver testified that she was still at the crime scene when Phinizee returned around 6:30 a.m. She saw Phinizee talking to a news reporter from inside Hoskins's car. A police officer asked Phinizee to exit the car, and Phinizee complied. As he did, a 9mm shell casing dropped from his lap onto the driver's seat. Phinizee was then arrested.

¶16. Driver later obtained a search warrant for Phinizee's phone records, which showed that in the days prior to the shooting, Phinizee called Shelley several times. On March 24, 2020, Driver questioned Shelley, and Shelley provided a written statement. Shelley stated that Phinizee showed up at her townhouse and asked if she would take him to a friend's house. Shelley said she agreed and dropped Phinizee off at a stop sign somewhere in Olive Branch. In her written statement, Shelley stated that Phinizee returned to her townhouse around 5:40 a.m. and told her that he "had a tussel [sic] with [Hoskins] and [Hoskins] shot herself as they fight [sic] over the gun." Shelley told Driver that Phinizee said he had thrown the gun in the Mississippi River. Driver released Shelley and did not talk to her again until after Phinizee and Shelley were indicted in August 2020.

¶17. Driver interviewed Shelley two additional times, and Shelley provided more details

6

during each subsequent interview. Driver testified that witnesses often provide different or additional information over time and "skate around the truth" because "people . . . don't want to implicate themselves." Driver acknowledged that Shelley's statements were inconsistent in the sense that each contained new details, but Driver was able to independently corroborate much of what Shelley told her.

¶18. At trial, Hoskins testified that she and Phinizee were married for about ten years and lived in Columbus, Mississippi, during the marriage. They had three children together: K.P., B.P., and R.J.[2] Hoskins's child from a previous relationship also lived with them. The couple separated in early 2019, and Hoskins and her four children moved to Olive Branch. Hoskins said that although Phinizee "wasn't around like that," the children loved him and "were crazy about" him. Hoskins stated Phinizee, who worked as a truck driver, would visit the children when he could and that she never prevented him from seeing them. Hoskins filed for divorce in January 2020.

¶19. Hoskins testified that she had never owned a gun and only had possession of a gun once when she borrowed Phinizee's car for a few days in December 2019. She testified that she was having car trouble, and Phinizee loaned her his car and told her that there was a gun in the glove box for protection. Hoskins, who worked as an independent "Medicare broker," testified that while borrowing Phinizee's car, she removed his gun from the glove box and took a photograph of it with some of her flyers about insurance open enrollment. She then posted the photograph on Facebook along with the following message:

---

[2] We use initials to protect the privacy of the minor children.

With all these DMs About sex trafficking, she [(the gun)] sits on the seat before I pull out my garage or in my coat pocket.. IM A FEMALE I TRAVEL MILES ON THE DAILY FROM STATE TO STATE. I HAVE TO PROTECT MYSELF.. If i dont who will. OAN [(i.e., on another note)] OPEN ENROLLMENT ENDS IN 11 DAYS DM TO ENROLL2 [(laughing emoji)] NO FRFR [(i.e., for real, for real)].

The Facebook post was admitted into evidence at trial. Hoskins testified that she posted the photo because she "just . . . thought it would catch attention for open enrollment season."

¶20. Hoskins testified that on February 9, 2020, she and her children returned to Olive Branch from a trip to visit family in West Point. Hoskins said that she had "a bad feeling" that night and told her children to "sleep with [her]." Hoskins and her children went to bed around 11 p.m., and they all slept in her bedroom. R.J. slept beside Hoskins in the bed, and the other three children slept on the floor beside her bed.

¶21. Hoskins testified she woke with "Phinizee's hand around [her] throat pressing into [her] windpipe." She could not breathe or scream but was able to slide out of bed. As she moved, Phinizee's hand slipped, and Hoskins was able to alert one of her children that she was being attacked. Phinizee resumed choking Hoskins, and she fell. As she got up, she grabbed Phinizee between the legs, and "that's what released his hands from around [her] throat." Hoskins testified that as she stood up, Phinizee suddenly "put a gun to [her] stomach" and shot her once.

¶22. K.P. turned on a light, and Phinizee began yelling at the children to get in Hoskins's car. Phinizee asked Hoskins for her phone, and Hoskins told him that it was in the glove box in her car. Phinizee and all four children got into Hoskins's car and left. Hoskins was able to get to White's house, and White immediately called 911. An ambulance transported

8

Hoskins to the emergency room, where she underwent emergency surgery. During Hoskins's first two weeks at the hospital, she could not talk or walk. She was hospitalized for approximately two months, had "five or six surgeries," attended physical therapy for a year, and continued to suffer from injuries to her spleen, gallbladder, and small intestine.

¶23. K.P. testified that she was seven years old on February 9-10, 2020. That night, she was awoken by a gunshot. She turned on a light and saw her mother on the ground, bleeding, and her father standing over her mother. Phinizee yelled at K.P. and her siblings to get in Hoskins's car. Phinizee then asked Hoskins where her phone was. K.P. and her siblings got in the car, and Phinizee drove them away. They stopped somewhere, and Phinizee got out. The children all stayed in the car. Phinizee eventually returned and then drove back to Hoskins's house.

¶24. K.P. said that on the drive back to Hoskins's house, Phinizee instructed the children to tell the police that Hoskins had picked up Phinizee in West Point and that Hoskins had been drinking and had tried to kill Phinizee. K.P. testified that none of those things were true. The police interviewed K.P. when they returned to Hoskins's house. K.P. acknowledged that during that interview, she told police that Hoskins "gets drunk and tells [the children] to do [their] homework."

¶25. Detective Craig Dickson testified that he assisted Driver in the investigation, including the search of Phinizee's car. In the car's trunk, Dickson found a full gas can, 18-inch zip ties, a roll of blue Gorilla tape, and a 9mm magazine.

¶26. J.P., Phinizee's daughter from a prior relationship, was the only defense witness. She

9

testified that Phinizee and Hoskins moved to Olive Branch in February 2019 because Phinizee had gotten a job as an electrical lineman. J.P. said that Phinizee paid the bills at the home in Olive Branch and that a pair of shoes found in Hoskins's room after the shooting belonged to Phinizee. On cross-examination, J.P. acknowledged that her father also worked as a truck driver, and she was not sure exactly when he worked as a lineman. She also acknowledged that she was "close with" Phinizee and would "do anything for him."

¶27.    The trial court instructed the jury on the indicted offenses of conspiracy to commit murder and attempted murder. The court refused Phinizee's request for a jury instruction on the lesser offense of aggravated domestic violence. After deliberating for less than thirty minutes, the jury sent out two notes that stated, "Was there any forced entry[?]" and "Was the machete ever found[?]" The court instructed the jury that they had all the evidence they would receive and to continue deliberating. About an hour and a half later, the jury sent out a note that stated, "We the jury are hung." Over Phinizee's objection, the court called the jury back into the courtroom and gave a *Sharplin*[3] instruction.[4] Less than one hour later, the jury sent out two notes that stated, first, "We the jury are STILL hung . . .!!" and, second, "We the jury would like to have [a] break to clear our heads for a few[.]" In response, the court allowed the jury to take a "5- or 10-minute recess" from the jury room. Shortly after resuming deliberations, the jury returned a verdict finding Phinizee guilty of both counts. A separate sentencing hearing was held pursuant to Mississippi Code Annotated section 97-

---

[3] *Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976).

[4] In response to Phinizee's objection, the court stated that after a two-day trial in "a very serious case," the jury could "deliberate a little longer than two hours."

10

1-7(2) (Rev. 2020) to determine whether Phinizee should be sentenced to life imprisonment for the crime of attempted murder. After the jury could not unanimously agree on a sentence of life imprisonment, the trial court then sentenced Phinizee to serve consecutive sentences of twenty years in custody for conspiracy to commit murder and twenty-two years in custody for attempted murder. Phinizee filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

I. **Whether there is sufficient evidence to support a conviction for conspiracy to commit murder.**

¶28. Phinizee first argues that there is insufficient evidence to support his conviction for conspiracy to commit murder. We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). When reviewing the sufficiency of the evidence, "we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017) (citing *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010)). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—*and in fact we must refrain from deciding*—whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Lenoir*, 222 So. 3d at 279 (¶25) (citation omitted) (quoting *Poole*, 46 So. 3d at 293-94 (¶20)). "[W]e must affirm the conviction as long as there is

sufficient evidence for a rational juror to find that the State proved all elements of the offense" beyond a reasonable doubt. *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶29. "The elements of a conspiracy require recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose." *Lollis v. State*, 373 So. 3d 1004, 1007 (¶11) (Miss. 2023) (brackets and quotation marks omitted). "A conspiracy is a separate, complete offense and the crime is completed once the agreement is formed." *Id.* (ellipsis omitted) (quoting *State v. Thomas*, 645 So. 2d 931, 933 (Miss. 1994)). "The agreement need not be formal or express, but may be inferred from the circumstances, particularly from declarations, acts and conduct of the alleged conspirators." *Id.* at (¶13) (quoting *Thomas v. State*, 591 So. 2d 837, 839 (Miss. 1991)).

¶30. Phinizee argues there was no conspiracy to commit murder because he and Shelley did not share a "union of the minds," and Shelley neither agreed nor intended to further a plan to commit murder. Phinizee argues that Shelley claimed "she acted out of fear, duress, coercion and manipulation" and that her testimony negates any potential conspiracy because a conspiracy requires "free will." Phinizee emphasizes that Shelley herself pointedly testified that there was no conspiracy.

¶31. However, the State presented significant evidence from which the jury could infer the existence of a conspiracy between Shelley and Phinizee. The jury could "infer[] from the circumstances" that Shelley and Phinizee entered into a common plan, took steps together to murder Hoskins, and then took additional steps to conceal the crime and conspiracy.

12

*Lollis*, 373 So. 3d at 1007 (¶13) (quoting *Thomas*, 645 So. 2d at 933). Shelley testified that soon after Phinizee arrived at her townhouse, he told her that the "bitch" (i.e., Hoskins) "had to go." Moreover, Phinizee asked Shelley for suggestions as to where he could dispose of a body. Shelley suggested Harbor Town, and the two of them went together to scout the location. Shelley then agreed to accompany Phinizee to Olive Branch, and on the way, Phinizee discussed ways to dispose of and dismember a body. Shelley testified that Phinizee took various tools with him, including a gun, a hatchet, a full gas can, and zip ties. Shelley eventually understood that they were headed to "the vicinity of" Hoskins's house. A few hours later, Shelley accepted a gun from Phinizee and agreed to dispose of it for him. No evidence contradicted Shelley's testimony. Shelley's subjective belief that she was not part of a conspiracy does not negate her testimony describing numerous steps she took to assist Phinizee in the commission of the crime.[5] Shelley and Phinizee's agreement can be inferred from the circumstances and from their acts and conduct, *id.*, and reasonable, fair-minded jurors could find that Phinizee conspired with Shelley to murder Hoskins. *Poole*, 46 So. 3d at 293 (¶20). Therefore, Phinizee is not entitled to a judgment of acquittal on that count.

II.     **Whether the trial court erred by excluding hearsay testimony that Hoskins previously attacked Phinizee.**

¶32.    During Phinizee's first trial, outside the presence of the jury, he proffered testimony

_____

[5] Shelley testified that she never called the police "because [she] didn't know . . . where to tell them to go" and because she was afraid. However, after she left Phinizee near Hoskins's house, Shelley could have withdrawn from the conspiracy and alerted law enforcement. Instead, she simply went home and then helped Phinizee dispose of evidence and conceal the crime afterward. Given the substantial assistance that Shelley provided, there clearly was sufficient evidence for the jury to infer the existence of a conspiracy.

13

from retired law enforcement officer James Shelton. Shelton, who is also Phinizee's uncle, testified that in 2011 he encountered Phinizee when he was dispatched to a "domestic" incident in his capacity as a Lowndes County deputy sheriff. Shelton testified that he asked dispatch to send another deputy once he realized that his nephew Phinizee was involved. Shelton testified that when he arrived at Phinizee's house, Phinizee "had scratches on his neck and . . . chest [that] were bleeding." Shelton testified that Phinizee said that Hoskins "had jumped on [him]." Hoskins was not present, and Shelton admitted that he did not talk to Hoskins, determine if Hoskins was injured, or do anything to confirm Phinizee's account. Following the proffer, the court ruled that Shelton's testimony was inadmissible.

¶33. Prior to Phinizee's second trial, the State again moved to exclude Shelton's testimony. Defense counsel stated that she assumed that the court's ruling would remain the same, and the State agreed that Phinizee's prior proffer was sufficient to preserve the issue for appeal. However, the trial judge stated that she would "hold [her ruling] in abeyance" and that Phinizee should either call Shelton as a witness or make an appropriate motion at the end of the State's case-in-chief. After the State rested its case-in-chief, Phinizee moved to proffer Shelton's testimony from the first trial. The State had no objection. But the trial judge stated that she would "prefer the proffer be done today in this case so that there's no confusion." Defense counsel stated that Shelton was not present and was "three hours away." The judge then stated that she would take the matter under advisement. Following a recess, the judge explained that she did not "read a record from a mistrial" because she did not want to confuse the evidence from the two trials. The judge then ruled as follows:

14

So, first, [Shelton] is not here, and so I'm not considering that. However, even if he were here, my recollection is [that Shelton] was not an eyewitness to any altercation between the defendant and the victim or the alleged victim. [Shelton] did not know who the initial aggressor was because he was not at the scene of the occurrence. There was no conviction presented, as I recall. The age, as far as the allegations went, were approximately nine years ago at the time of the offense. So nine years from February of 2020. And, of course, there were more -- they are more lengthy now. Also, I mean, it's hearsay.

¶34. We review a trial court's evidentiary rulings for "abuse of discretion." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005). "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice . . . the accused in a criminal case, we will affirm the trial court's ruling." *Id.*

¶35. Here, the trial judge provided multiple reasons for excluding Shelton's testimony, including that it was hearsay. Hearsay is a statement made by an out-of-court declarant offered to prove the truth of the matter asserted. MRE 801(c). Thus, to determine whether a statement is hearsay, we must first determine the purpose for which it was offered and admitted. *Edwards v. State*, 379 So. 3d 906, 911 (¶23) (Miss. Ct. App. 2024). In general, hearsay is not admissible except as otherwise provided by law. MRE 802.

¶36. Here, Phinizee offered Shelton's testimony to show that Hoskins had committed a prior act of violence against him. Phinizee maintains that this testimony would have supported his claim that he shot Hoskins in self-defense.[6] Thus, Phinizee was offering Shelton's testimony for its truth—that Hoskins had assaulted him in the past. However,

---

[6] Phinizee argues that Shelley's first written statement to law enforcement supported his claim of self-defense. Specifically, he relies on Shelley's statement that he said he "had a tussel [sic] with [Hoskins] and [Hoskins] shot herself as they fight [sic] over the gun." Phinizee produced no other evidence to support a claim of self-defense. Nonetheless, defense counsel argued during closing arguments that Phinizee acted in self-defense.

15

Shelton admittedly was not present when the 2011 domestic incident occurred. Rather, Shelton could only repeat what Phinizee had told him about the alleged incident. Thus, the out-of-court declarant here was Phinizee, not Shelton. The trial judge properly excluded Shelton's testimony as hearsay.[7] There may have been additional good reasons to exclude Shelton's testimony. But the fact that it is hearsay was a sufficient reason in and of itself. Therefore, the trial judge did not abuse her discretion by so ruling.

### III. Whether Phinizee was entitled to a jury instruction on aggravated assault.

¶37. At the jury instruction conference, Phinizee requested an instruction on the lesser offense of aggravated domestic violence.[8] He argued there was a factual basis for the

---

[7] A statement "made by" and "offered *against* an *opposing* party" "is not hearsay." MRE 801(d)(2) (emphasis added). Thus, the State may offer a defendant's out-of-court statements *against* him. Here, however, Phinizee was attempting to use Shelton as a conduit for his own out-of-court statements. No exception to or exclusion from the hearsay rule applies to Phinizee's attempt to introduce his own out-of-court statements.

[8] The requested instruction (D-11) stated in relevant part:

If you find that the State has failed to prove, beyond a reasonable doubt, any one or more elements of the crime of Attempted First Degree Murder, you shall find [Phinizee] not guilty of this original charge and proceed with your deliberations to decide whether the State has proven, beyond a reasonable doubt, all of the elements of the lesser offense of Domestic Aggravated Assault.

After deliberations on the lesser offense of Domestic Aggravated Assault, if you find from the evidence, beyond and reasonable doubt, that:

1.  On or about February 10, 2020, in DeSoto County, Mississippi;
2.  [Phinizee] did purposely, knowingly, or recklessly cause bodily injury to [Hoskins];
3.  With a deadly weapon, to-wit: a pistol,
4.  By shooting [Hoskins] in the stomach; and

16

"lesser-included" offense and that the instruction was an accurate statement of the law. In response, the State argued that aggravated domestic violence was "a lesser-related [offense] and not a lesser-included offense." The State also cited *Gebben v. State*, 108 So. 3d 956 (Miss. Ct. App. 2012), *overruled in part by Hye v. State*, 162 So. 3d 750, 764 (¶39) (Miss. 2015). In *Gebben*, this Court applied then-binding Mississippi Supreme Court precedent holding that an accused was entitled to a lesser-nonincluded-offense instruction "if—viewing the evidence in the light most favorable to the accused—a reasonable jury could find the defendant guilty of the lesser offense but not guilty of the greater offense." *Id.* at 970 (¶43). The State argued that under that standard, Phinizee was not entitled to an instruction on aggravated domestic violence. However, in *Hye*—which was decided several years before Phinizee's trial—the Supreme Court expressly "overruled" its precedents "authorizing lesser-nonincluded offense instructions." *Hye*, 162 So. 3d at 764 (¶39). After considering the arguments of counsel, the trial court refused Phinizee's proposed instruction, citing *Hye* and finding that there was no "basis [for] a lesser offense instruction."

¶38.    On appeal, Phinizee's argument has shifted away from the actual language of the instruction he requested at trial. Phinizee now argues that he was entitled to a jury instruction on traditional aggravated assault rather than aggravated domestic violence. Unlike aggravated domestic violence, aggravated assault does *not* include a family or dating relationship between the perpetrator and the victim as an element of the offense. *Compare*

5.      That [Hoskins] was the spouse of [Phinizee] at the time; and
6.      It was not in necessary self-defense,
then you shall find [Phinizee] guilty of Domestic Violence Aggravated Assault.

17

Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2020) (aggravated assault), *with* Miss. Code Ann. § 97-3-7(4)(a) (Rev. 2020) (aggravated domestic violence). In addition, Phinizee argues that he was entitled to an aggravated assault instruction on theories other than those covered by his proposed instruction D-11, e.g., that he attempted to cause serious bodily injury or attempted to cause bodily injury with a deadly weapon. In response, the State argues that aggravated assault is never a lesser-included offense of attempted murder. In the alternative, the State argues that even if aggravated assault could be a lesser-included offense, there was no factual basis for such an instruction in this case because no rational jury could have found Phinizee not guilty of attempted murder and yet guilty of aggravated assault.

¶39. We begin our analysis by noting that Phinizee clearly was *not* entitled to the jury instruction he requested at trial because aggravated domestic violence is not a lesser-included offense of attempted murder. Aggravated domestic violence is not a lesser-included offense of attempted murder because it includes at least one element—a family or dating relationship between the perpetrator and the victim—that attempted murder does not. *See Hye*, 162 So. 3d at 754 (¶8) ("A lesser offense is necessarily included in the greater offense if the elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.").[9] It is perhaps debatable whether

---

[9] *Cf. Davis v. State*, 347 So. 3d 1205, 1211 (¶12) (Miss. Ct. App. 2022) (affirming by an evenly divided Court) (Lawrence, J., joined in full by three judges and one judge in part and in result) ("Since an essential element of simple domestic violence is a specific relationship between the victim [and] the defendant, which is not included in the crime of abuse of a vulnerable person, simple domestic violence is not a lesser-included offense of abuse of a vulnerable adult."); *id.* at 1216 (¶28) (Barnes, C.J., dissenting, joined in full by four judges) (agreeing that simple domestic violence was not a lesser-included offense).

the trial judge had a duty to sua sponte correct Phinizee's proposed instruction and consider it as an instruction on traditional aggravated assault.[10]

¶40. In addition, we have identified no precedent that clearly addresses the question whether aggravated assault may ever or under any circumstances be a lesser-included offense of attempted murder under Mississippi law.[11] There is a historical explanation for this absence. The specific crime of attempted murder was not added to the attempt statute until 2013. *See* 2013 Miss. Laws ch. 510, § 1 (H.B. 28). Prior to 2013, a conviction for attempted murder carried a maximum sentence of ten years' imprisonment, which was less than the maximum sentence for aggravated assault. *See McGowan v. State*, 541 So. 2d 1027, 1027-28 (Miss. 1989); *Smith v. State*, 106 So. 3d 877, 880 (¶8) (Miss. Ct. App. 2013). Thus, prior to 2013, there was no practical incentive for the State to prosecute a defendant for the offense of attempted murder.

¶41. Having made these initial observations, we conclude that it is unnecessary in this case to determine whether aggravated assault may ever or under any circumstances constitute a

---

[10] *Compare id.* at 1211-16 (¶¶13-25) (Lawrence, J., joined in full by three judges and one judge in part and in result) (arguing the trial judge had no duty to correct a proposed instruction on simple domestic violence and consider it as an instruction on simple assault), *with id.* at 1218-20 (¶¶32-41) (Barnes, C.J., dissenting, joined in full by four judges) (arguing that Mississippi Supreme Court precedent required the trial judge to correct the instruction and consider it as an instruction on simple assault).

[11] In *Bell v. State*, 394 So. 3d 461, 462-63 (¶5) (Miss. Ct. App. 2024), which involved a motion for post-conviction relief, we noted, without further discussion, that the movant previously pled guilty to aggravated assault as a lesser-included offense of attempted murder. In *Evans v. State*, 282 So. 3d 659, 661 (¶7) (Miss. Ct. App. 2019), we noted, without further discussion, that the defendant had been convicted of aggravated assault as a lesser-included offense of attempted murder.

lesser-included offense of attempted murder. We need not decide that issue today because even if we assume for the sake of argument that aggravated assault is a lesser-included offense, there was no factual basis for such an instruction in this case.

¶42. This Court recently summarized the standard of review and law on this issue:

> [W]e review de novo the refusal of lesser-included-offense instructions, "as this is a question of law." *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007). "A defendant has a right to a lesser-included-offense instruction if there is some evidence from which a reasonable juror could find him *both* not guilty of the indicted offense *and* guilty of the lesser-included offense." *Curtis v. State*, 298 So. 3d 446, 451 (¶11) (Miss. Ct. App. 2020) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)), *cert. denied*, 316 So. 3d 202 (Miss. 2021). But "lesser-included-offense instructions should not be indiscriminately granted; instead, the jury should not be presented with a lesser-included-offense instruction unless the record provides an evidentiary basis for the instruction." *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (quotation marks omitted). "Additionally, lesser-included-offense instructions should not be granted on mere speculation." *Id.*

*Wallace v. State*, 369 So. 3d 83, 87 (¶13) (Miss. Ct. App. 2023).

¶43. Therefore, whether there was a factual basis for an aggravated assault instruction depends on whether a reasonable juror could have found Phinizee both not guilty of attempted murder and yet guilty of aggravated assault. *Id.* To convict Phinizee of attempted murder, the jury was required to find that he shot Hoskins with the deliberate design to effect her death and not in necessary self-defense. Phinizee posits that the jury could have instead convicted him of aggravated assault by finding that he shot Hoskins with the intent to do her bodily harm or serious bodily harm and not in necessary self-defense. *See* Miss. Code Ann. § 97-3-7(2)(a).

¶44. On appeal, Phinizee argues that some evidence, admittedly "meager," supported such

20

an instruction. He argues that one basis for an aggravated assault instruction lies in his own statement to Shelley that he and Hoskins "got into it," and the gun fired, hitting Hoskins once in the stomach. He also points to evidence that he arrived on Hoskins's street around 1 a.m. but did not shoot her until around 4 a.m. Phinizee argues that this three-hour gap permits an inference that he and Hoskins had time to "interact" in some unspecified manner before he shot her with the gun. He also points to Hoskins's Facebook post with a picture of a gun, although Hoskins testified that the gun belonged to Phinizee.

¶45. However, Shelley testified that before Phinizee went to Hoskins's house, he stated that the "bitch" (Hoskins) "had to go" and asked about good places to dispose of a body. Phinizee and Shelley then drove to scout out one location that Shelley recommended, and Phinizee drove to Hoskins's street armed with a gun, zip ties, a hatchet, and a full gas can. As they drove, Phinizee discussed techniques for dismembering and disposing of a body. The evidence showed that Phinizee then attempted to strangle Hoskins and shot her in the stomach. This evidence all strongly supports the jury's finding that Phinizee acted with the deliberate design to kill Hoskins. In contrast, we fail to see how any of the evidence that Phinizee cites would permit a reasonable inference that he did *not* intend to kill Hoskins and only meant to do her some bodily harm. Rather, we think "[s]uch a conclusion would require speculation unsupported by any evidence presented by the State or by the defense." *Curtis*, 298 So. 3d at 452 (¶14). As stated above, "lesser-included-offense instructions should *not* be granted on mere speculation." *Franklin*, 136 So. 3d at 1026 (¶11) (emphasis added). Accordingly, Phinizee was not entitled to an instruction on aggravated assault.

## CONCLUSION

¶46.    There is sufficient evidence to support Phinizee's conviction for conspiracy to commit murder, the trial judge did not abuse her discretion by excluding Shelton's hearsay testimony, and Phinizee was not entitled to a jury instruction on aggravated assault.

¶47.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**